[No. S004711. Crim. No. 25425. May 2, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
TIEQUON AUNDRAY COX, Defendant and Appellant.

634

636

**COUNSEL**

Colleen E. Butler, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Robert F. Katz and Carol Wendelin Pollack, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

ARABIAN, J.—A jury adjudged defendant Tiequon Aundray Cox guilty of the first degree murders of Ebora Alexander, Dietria Alexander, Damon Bonner, and Damani Garner (Pen. Code, § 187), and found true a special circumstance allegation that he committed multiple murders (Pen. Code, § 190.2, subd. (a)(3)).[1] The jury further determined he should be sentenced to death. The trial court denied defendant's motion for a new penalty trial and refused to modify the verdict (§ 190.4, subd. (e)). This appeal is automatic (§ 1239, subd. (b)).

## I. FACTS

### A. *Guilt Phase Evidence*

The murders occurred August 31, 1984, in the home of Ebora Alexander, preceded by the following events: About 5:30 or 6 that morning, Darren Williams and Horace Burns arrived at the residence of Ida Moore, where Lisa Brown was also present. Williams, an acquaintance of both women, used the telephone. He then asked Moore for a ride, which she agreed to furnish, and told Burns to go pick up someone; Burns returned five or ten minutes later with defendant.

The group left in Moore's van, with Moore driving, Brown in the passenger seat, and the three men in the back. After stopping for some gasoline, which Moore had to pay for, Williams directed them to 59th Street in Los Angeles and began looking for an address he had written on a piece of paper. When he had located the house in question, he told Moore to park down the street and leave the engine running. After they parked, Brown heard one of the men say they were going "to kill everybody in the house." Williams told Burns to stay behind while he and defendant got out and walked toward the Alexander residence.

Brown did not see any weapons at that time. However, Moore had seen "a big gun" in the back of the van when they stopped for gas; defendant

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

carried something wrapped in a jacket as he left. She also saw that Williams had a handgun in his waistband. After Williams and defendant entered the house, the two women heard the sound of gunfire. Two or three minutes later, Williams came running back to the van holding the handgun and telling Moore to leave. Defendant followed in a minute or two with a rifle in his hands. As he entered the van, he said, "I just blew the bitch's head off. So drive." Moore then drove quickly away.

Several other persons witnessed relevant events. Lashawn Driver lived one or two doors away on the opposite side of the street. About 7:30 a.m., she was returning home when she saw two men enter the Alexander home and then heard approximately five gunshots. After one of the men came out, she heard another series of shots. The second individual, whom she identified as defendant, then left the house carrying a rifle. Both men went down the street.

Venus Webb also lived across the street. On the morning of the murders, she heard shooting and went to investigate. When she looked out her front window, she saw defendant leaving the Alexander house and walking rapidly toward a van, which pulled around the corner at a fast pace and disappeared. Webb later identified defendant at a live lineup.

Ebora Alexander's 14-year-old son Neal and her grandson Ivan Scott were in the house when Williams and defendant entered. Neal awoke when he heard a scream and the sound of a shot. He saw a man standing in his sister Dietria's room holding a rifle. The man was facing the opposite direction toward his sister's bed; Neal jumped on his back and started fighting with him. When the man hit him on the face, Neal ran through the back door. Other than family members, he saw no one else in the house. Ivan also awoke to gunshots and ran into a closet. From that vantage, he saw his uncle Neal run down the hallway and heard an ensuing struggle. He also glimpsed a man he could not identify, who was carrying a rifle.

Upon returning to the van, Williams and defendant told Moore to drive away and eventually had her stop at Vermont Avenue and Gage Street, where all three men got out and entered a building known as the Vermont Club. One or two hours later, Moore saw Williams at the home of James Kennedy, where Williams gave her $50 to purchase some personal items for him and to pay her for the gas. Later in the day, she saw him again and observed he was wearing new clothes and jewelry. About 9 a.m., Brown received a telephone call from Williams, who directed her to bring his car to the Vermont Club. When she arrived, defendant was also there; she saw someone hand him a rifle over a fence, which he put in the trunk of the car. Brown drove defendant to an apartment building, where he took the rifle

after wrapping it in a jacket. Williams later gave Brown $20. That afternoon, defendant purchased a 1975 Cadillac, paying $3,000 in cash for it.[2]

James Kennedy was a personal friend of defendant, Williams, and Burns through gang association. On the morning of August 31, defendant brought him a semiautomatic .30-caliber carbine wrapped in a jacket and told him to destroy it. He also asked Kennedy to have his sister wash the jacket because it had gunpowder on it. Kennedy took the jacket to his sister but did not destroy the rifle, instead putting it in some bushes near his residence. On September 27, Kennedy was the subject of a narcotics investigation during which he revealed the location of the weapon to law enforcement officers. After defendant's arrest, an acquaintance, Cassandra Haynes, spoke with him in jail. Defendant asked her if the police had found the gun he gave to Kennedy, but she did not know for certain.

Shortly after the shootings, the police were summoned to a scene of horror at the Alexander house, where they found the bullet-riddled bodies of 57-year-old Ebora, her 23-year-old daughter Dietria, and 2 of her grandsons, 8-year-old Damon Bonner and 10-year-old Damani Garner. Ebora had been sitting at her kitchen table drinking coffee when she was killed; Dietria, Damon, and Damani were in a bedroom, still in their beds. The coroner determined they had died of gunshot wounds to the head or body; Ebora suffered one wound that caused part of her brain tissue to be blown away. In the course of their investigation, police retrieved empty shell casings and spent bullets from the vicinity of each body. Ballistics testing established they all came from the same semiautomatic .30-caliber carbine defendant gave James Kennedy.

The police investigators also lifted a latent palm print from a trunk located in the bedroom where the younger victims had been sleeping. After comparing it with an exemplar, two experts concluded only defendant could have made the print. Ebora's son, Kermit Alexander, and two of her daughters, Geraldine Alexander (Damani's mother) and Daphine Bonner (Damon's mother), testified they had never seen defendant in their mother's house. Daphine Bonner also indicated Dietria had purchased the trunk for her bedroom approximately two and a half weeks before the shootings.

---

[2] At the penalty phase, the defense presented evidence that shortly before the killings defendant's great-grandmother had cashed several $10,000 Treasury bills for her great-grandchildren. She kept the money at her house and gave defendant $3,000 when he asked for it to buy the Cadillac. On rebuttal, a bank officer testified that records showed the money had been placed in another account and no withdrawals had been made at the time indicated. Defendant's great-grandmother then stated the Treasury bills had been in other family names.

B. *Penalty Phase Evidence*

At the penalty phase, the prosecution presented evidence of two robberies defendant was involved in as a juvenile. In May 1981, Rosalyn Lebby was rousted from her car by defendant and another teenager as she waited for her young son after school. Impliedly threatening Lebby with a gun, defendant took her vehicle and led police on a high-speed chase for half an hour through city streets, stopping only when he hit a telephone pole. The police recovered a .32-caliber revolver from the driver's side of the car.

One month earlier, defendant and a companion accosted three junior high school students. He hit two of them with his fist and a piece of mop handle and demanded money from all three.

The defense offered evidence of defendant's upbringing and school environment. He had been virtually abandoned at an early age by his mother, who had a drinking problem and had gone to prison for bank robbery. He and his younger brother and sister had been raised by his 65-year-old great-grandmother, who he felt was somewhat strict. For that reason he ran away from her house at the age of 14 and went to live with his grandmother. He had very little contact with his father.

One of defendant's junior high school teachers described him as skilled in athletics and capable of achieving good grades. However, peer pressure from the neighborhood gangs was a serious distraction to male students, particularly those who did not have strong role models. One of the junior high school administrators also felt defendant had been a good student until it appeared he had joined a local gang. He then began having behavior problems, which led to his expulsion.

Defendant's great-grandmother, grandmother, sister, brother, and teacher all testified they cared for him and wished to see him live. He had been good to his brother and sister and warned them to stay away from gangs. His great-grandmother stated she did not believe defendant was guilty because he had told her he did not hurt anyone.

Joey Upland, formerly a nurse at San Quentin Prison, described the living conditions of those sentenced to life imprisonment without possibility of parole. They are subject to frequent lock downs during which they are confined to the small cells they must share with another prisoner. Life in prison is very violent and without many amenities such as regular showers and laundry exchange.

## II. JURY SELECTION

### A. *Witherspoon/Witt Error*

The court initially conducted a sequestered voir dire to determine whether those in the venire could perform their duties irrespective of their attitudes toward the death penalty. (See *People* v. *Hovey* (1980) 28 Cal.3d 1, 80-81 [168 Cal.Rptr. 128, 616 P.2d 1301].) The court explained to each prospective juror the trial procedure by which the jury would first determine defendant's guilt and the truth of the special circumstance allegation. Only if both issues were resolved against defendant would the question of penalty arise.

Next, the court posed two standard inquiries: "Are your feelings about the death penalty such that you could never vote for the death penalty regardless of the evidence presented?"; and "Are your feelings about the death penalty such that you would always vote for the death penalty regardless of the evidence presented?" Depending upon the responses, the court or counsel asked follow-up questions to clarify the prospective juror's attitude and ability to conform to the law as instructed. Eleven venirepersons were excused for cause due to their expressed inability to impose capital punishment under any circumstances. Although he raised no objection at the time, defendant challenges these rulings as violative of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].

In *Witherspoon*, the United States Supreme Court approved a state's authority to exclude for cause all prospective jurors "who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*." (391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].)

The standard was modified in *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844], to permit excusal for cause if a prospective juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' [Footnote omitted.]" This explication not only dispenses with *Witherspoon*'s reference to "automatic" decisionmaking but also eliminates the concern that the record establish the requisite bias with "unmistakable clarity." (*Ibid.* [83 L.Ed.2d at p. 852]; see also *Adams* v. *Texas* (1980) 448 U.S. 38, 44-45 [65 L.Ed.2d 581, 588-589, 100 S.Ct. 2521].) We adopted the *Witt* standard as a matter of state constitutional interpretation in *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250], finding

that the revised formulation and underlying rationale made good sense and noting that California courts have generally followed the teachings of the high court in these matters. (See also, e.g., *People* v. *Howard* (1988) 44 Cal.3d 375, 417-418 [243 Cal.Rptr. 842, 749 P.2d 279].)

■ Defendant argues that *Witherspoon* articulated prevailing state law at the time of his trial and thus should govern on review. However, "[w]e have applied *Witt* retroactively in numerous cases [citation], and we are satisfied that our practice is in conformity with constitutional principles." (*People* v. *Gallego* (1990) 52 Cal.3d 115, 192 [276 Cal.Rptr. 679, 802 P.2d 169].) The Supreme Court intended the modification merely "to *clarify* [its] decision in *Witherspoon*, and to *reaffirm* the [review] standard from *Adams* [v. *Texas, supra,* 448 U.S. at page 45 (65 L.Ed.2d at page 589),] as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment." (*Wainwright* v. *Witt, supra,* 469 U.S. at p. 424 [83 L.Ed.2d at p. 851], italics added; see also *Darden* v. *Wainwright* (1986) 477 U.S. 168, 175-178 [91 L.Ed.2d 144, 153-155, 106 S.Ct. 2464].) Therefore, no constitutional considerations attend retroactive application. (See also *Griffith* v. *Kentucky* (1987) 479 U.S. 314, 328 [93 L.Ed.2d 649, 661-662, 107 S.Ct. 708].)

■ In any event, even under *Witherspoon* the trial court did not erroneously excuse any prospective juror. Defendant in part faults the court for not framing its inquiry with the word "automatic" or "automatically." However, no authority mandates the use of specific terminology in determining whether a venireperson is "irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) On the contrary, a primary purpose of this phase of voir dire is to enable the trial court to "assess the juror's state of mind" and thereby make a meaningful evaluation of his or her impartiality. (*People* v. *Coleman* (1988) 46 Cal.3d 749, 767, fn. 10 [251 Cal.Rptr. 83, 759 P.2d 1260].)

■ As a concomitant principle of review, we generally accord considerable deference to these evaluations, which "constitute[] a resolution of what is essentially a question of fact or, perhaps more accurately, a mixed question that is essentially factual. [Citation.]" (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1262 [270 Cal.Rptr. 451, 792 P.2d 251].) "If there are conflicting answers to the voir dire, the court may assess the juror's state of mind and is not bound by statements which, taken in isolation, are unequivocal. When such a prospective juror has both equivocated and taken (at some point) a clear stand, the wisdom of entrusting the ruling on the challenge for cause to the trial court becomes clear." (*People* v. *Coleman,*

*supra*, 46 Cal.3d at p. 767, fn. 10.) Thus, "where equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his true state of mind is binding on an appellate court." (*People* v. *Ghent, supra*, 43 Cal.3d at p. 768, citing *People* v. *Fields* (1983) 35 Cal.3d 329, 355-356 [197 Cal.Rptr. 803, 673 P.2d 680]; see also *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1224 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People* v. *Guzman* (1988) 45 Cal.3d 915, 954-955 [248 Cal.Rptr. 467, 755 P.2d 917]; *People* v. *Howard, supra*, 44 Cal.3d at p. 418.) "In the final analysis, 'the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record,' and ambiguities are to be resolved in favor of the trial court's assessment. [Citation.]" (*People* v. *Howard, supra*, 44 Cal.3d at p. 418; see also *People* v. *Gordon, supra*, 50 Cal.3d at p. 1262.)

 The record here reflects that each of the 11 prospective jurors excused for cause unequivocally expressed in one manner or another an inability to impose the death penalty irrespective of the facts. For example, prospective juror Starks initially indicated he could vote for the death penalty "under some circumstances." However, after the prosecutor clarified his understanding of the sentencing procedure, he affirmed he would "consider just the one" punishment, life imprisonment without possibility of parole, as the appropriate penalty and continued to reiterate that position after extensive questioning by defense counsel. Prospective juror Flores several times stated categorically, "I would never vote for the death penalty." Prospective juror Johnson declared without equivocation he "could never vote for a verdict of death."[3]

Viewing the voir dire in its entirety, we find the record sufficient to support the trial court's rulings. Defendant either bases his criticisms on excerpted portions of the voir dire, isolating particular answers out of

---

[3] The record discloses comparable responses from the others excused for cause: Prospective juror Haythorne expressly confirmed her inability to vote for a verdict of death "regardless of any evidence." Prospective juror Juanita Williams initially stated, "it's hard to say" whether she could vote for death, but subsequently indicated she could not follow the law "regardless of what has happened." Prospective juror Bell steadfastly averred she could not vote for the death penalty "regardless" of the defendant or the nature of the crime. Prospective juror Maddox also consistently expressed his unwillingness to impose death, believing "God will judge . . . ." Prospective juror Virginia Williams, although responding "I don't think so" to some voir dire questions, otherwise made it clear "under no circumstances" could she impose death. Similarly, prospective juror Magee first stated she "wouldn't want to" but later unequivocally affirmed she "would never be able to vote for the death penalty under any circumstances." Prospective juror Greenfeld repeatedly confirmed she "could never vote for a verdict of death." Prospective juror Perry also indicated "under no circumstances" would she vote for the death penalty and continued to assert that attitude during defense counsel's voir dire.

context, or fails to accord due deference to the court's fact-finding role. As we have elsewhere noted, "the trial court was in the best position to observe and evaluate [the prospective juror's] demeanor firsthand and could have reasonably understood the . . . responses to indicate he [or she] would never vote for the death penalty. [Citation.]" *(People v. Miranda* (1987) 44 Cal.3d 57, 95-96 [241 Cal.Rptr. 594, 744 P.2d 1127].) 

 The fact the court engaged in extensive inquiry with some prospective jurors before excusing them and not with others inferentially substantiates a proper discharge of its responsibility to assess carefully their individual understanding of the sentencing process and credibility in revealing their true state of mind relative to participating in that process.[4]

### B. *Denial of Challenge for Cause to Prospective Juror Deaton*

 From the reverse perspective, defendant contends the trial court erred in refusing to grant his challenge for cause to prospective juror Deaton. We apply the same analysis in assessing challenges for cause whether by the prosecution or the defense. *(People v. Coleman, supra,* 46 Cal.3d at pp. 764-765.) However, we need not resolve the substance of defendant's argument because the record reflects no possibility of prejudice. Deaton did not sit on the jury, nor was defendant required to exercise a peremptory challenge to prevent him from doing so. Moreover, he expressed his views on the death penalty during the *Hovey* voir dire outside the presence of the other prospective jurors. Accordingly, any possible error was entirely harmless. (See 46 Cal.3d at pp. 768-771.)

### C. *Prosecutor's Use of Peremptory Challenges To Eliminate Jurors Reluctant to Impose Death Penalty*

 Defendant contends he was denied the right to an impartial jury because the prosecutor excused "every juror who revealed any kind of scruples" during the death qualification voir dire and the court refused his request for additional peremptory challenges necessary to balance the proceedings. "[T]here is 'no . . . constitutional infirmity in permitting peremptory challenges by both sides on the basis of specific juror attitudes on the death penalty.' [Citation.]" *(People v. Walker* (1988) 47 Cal.3d 605, 624-625

---

[4] We also note that in each instance the court excused a prospective juror for cause, defense counsel either expressly affirmed no objection or implicitly acceded to the court's ruling. While the failure to object does not waive the right to raise the issue on appeal (see *People v. Velasquez* (1980) 26 Cal.3d 425, 443 [162 Cal.Rptr. 306, 606 P.2d 341]), in this situation it does suggest defense counsel's concurrence in the court's assessment of each venireperson's firm and sincere expression of his or her inability to impose the death penalty. (Cf. *People v. Balderas* (1985) 41 Cal.3d 144, 180 [222 Cal.Rptr. 184, 711 P.2d 480] [defense acceptance of jury without exhausting peremptory challenges is "strong indicator[] that the jurors were fair, and that the defense itself so concluded"].)

[253 Cal.Rptr. 863, 765 P.2d 70].) We discern no basis for concluding the defense is nevertheless entitled to more than its statutory allotment of peremptory challenges to "keep pace" with the prosecution in this process.

### D. *Hardship Excuses*

During voir dire, the court inquired whether a protracted trial would pose any financial burden. Several prospective jurors explained that they or their employer would suffer some significant hardship under such circumstances. The court then either excused them outright or did so after some verification from the employer. ■ Although defendant did not object at the time and cites no authority for such an objection, he now faults this procedure as depriving him of an impartial jury drawn from a representative cross-section of the community.

We have previously addressed a cognate argument and found it wanting: "Claims of denial of a fair cross-sectional jury are analyzed by ascertaining whether a cognizable class has been excluded. [Citation.] Even assuming that only poor persons were given hardship exclusions, a fact not proven here, persons with low incomes do not constitute a cognizable class. [Citations.]" (*People* v. *Johnson, supra,* 47 Cal.3d at p. 1214.) By a parity of reasoning, whether or not the court had a "blanket policy" of granting hardship excuses to all those not reimbursed by their employers, defendant has failed to identify a constitutionally impermissible basis on which these prospective jurors were excluded.

### III. GUILT PHASE ISSUES

### A. *Physical Restraint of Defendant During Trial*

Before discussing defendant's various contentions concerning the trial court's decision to have him physically restrained during trial, some factual background is in order:

Trial was set for September 9, 1985. On that day, after the master calendar court granted a defense continuance, the following exchange occurred:

"[DEFENSE COUNSEL]: Your Honor, Mr. Cox is shackled as you can see and I know he's never been a security problem.

"THE COURT [JUDGE MUNOZ]: I will make an order he not be shackled any other time he has an appearance in this courtroom."

When trial commenced on November 25, 1985, the court (Judge Boren) initially indicated, "I notice in the file that there had previously been an order granted at sometime with respect to shackles in this case. Obviously, I don't think that should be a problem at this stage when we're going to have the jury in . . . . [¶] There should be no need for shackling . . . ."

At this point, defense counsel requested an in camera hearing at which he disclosed the following:

"[DEFENSE COUNSEL]: Your Honor, first I would say that this does not constitute a conflict because any attorney representing Mr. Cox would be privy to this information. [¶] In our investigation of the case there—we think that there is some possibility that there may be an escape attempt in this case.

"THE COURT: Yes.

"[DEFENSE COUNSEL]: We would—we're against full shackles but I think there should be some—like a handcuff to a chair I think would be sufficient so the jury can't see.

". . . . . . . . . . . . . . . . . . . .

"THE COURT: For the safety of everyone, then?

"[DEFENSE COUNSEL]: For the safety of everyone. [¶] As an officer of the court, I feel that it's my duty to—in fact, we originally were going to ask for the 134 courtroom. But I don't really think that's necessary if you have adequate bailiff support, searching.

"THE COURT: Okay.

"[DEFENSE COUNSEL]: It's something, though, that should not be looked at lightly.

"THE COURT: Okay. All right. [¶] I will take that measure. . . ."

Defendant apparently was handcuffed to his chair during that day's proceedings. The next day counsel indicated, "Your Honor, Mr. Cox is—the record should reflect that he is handcuffed to the chair. It is very uncomfortable. We would ask that that be removed or some—" to which the court responded, "Well, I'm not going to have it removed."

A day or so later, defendant was brought to court wearing some kind of leg shackles. In answer to counsel's inquiry, the court stated, "At least for

today I am going to order that, based on information that has previously been placed on the record in this case, and also based on some information that was imparted to the court today and it is merely by way of rumor. . . . [¶] We may revert to the other procedure after today, but because of some of the things that have been brought to the court's attention, I think it is appropriate . . . . Just so that there is some added security, just from the unknown." Subsequently, the court amplified: "[T]he bailiff informed me there were certain rumors floating through the jail today that he was receiving information through other jail personnel that there was going to be an escape, an attempt today; and that's why there is the use of the shackles today. [¶] I don't know that it's anything more than a rumor; but in light of all the information, I felt it was better to be safe than sorry."

 Defendant remained shackled or handcuffed for the rest of the trial. He contends the actions of both the court and his own attorney violated his right to due process and impaired his ability to receive a fair trial. After examining the totality of the record, we conclude the trial court erred in failing to make the requisite record prior to ordering defendant restrained during the proceedings. However, the error was harmless; any deficiency on the part of trial counsel was equally nonprejudicial.

### 1. *Trial Court's Exercise of Discretion*

 In *People* v. *Duran* (1976) 16 Cal.3d 282, 290-291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1], we "reaffirm[ed] the rule that a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints. [Citation; footnote omitted.]" (See *People* v. *Harrington* (1871) 42 Cal. 165, 168-169; see also § 688 ["No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge."].) Under this standard, the trial court's discretion is relatively narrow. (See *People* v. *Duran, supra,* 16 Cal.3d at pp. 292-293.) "Manifest need" arises only upon a showing of unruliness, an announced intention to escape, or "[e]vidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained . . . ." (*Id.,* at p. 292, fn. 11.) Moreover, "[t]he showing of nonconforming behavior . . . must appear as a matter of record . . . . The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (*Id.,* at p. 291.)

 The record before us fails to demonstrate the requisite manifest need. While no formal hearing as such is necessary to fulfill the mandate of

*Duran,* the court is obligated to base its determination on facts, not rumor and innuendo even if supplied by the defendant's own attorney. While the instant record may be rife with an undercurrent of tension and charged emotion on all sides, it does not contain a single substantiation of violence or the threat of violence on the part of the accused. Although the shackling decision was not based on a "general policy" to restrain all persons charged with capital offenses, neither did it follow "a showing of necessity" for such measures. (See *People* v. *Duran, supra,* 16 Cal.3d at p. 293.) Accordingly, the trial court abused its discretion in ordering defendant physically restrained in any manner. *(Ibid.)*

This conclusion does not compel reversal, however. The record makes equally clear that any error did not impair the right to a fair trial. ▆▆ The rule in *People* v. *Duran, supra,* seeks to avoid the pernicious effect of the "possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system . . . , as well as the effect such restraints have upon a defendant's decision to take the stand . . . ." (16 Cal.3d at p. 290; see also *Illinois* v. *Allen* (1970) 397 U.S. 337, 344 [25 L.Ed.2d 353, 359, 90 S.Ct. 1057].) In assessing the impact on the right to a fair trial, the first and last of these considerations predominate. Thus, in *Duran* we reversed the conviction in part because the defendant, "who elected to testify in his own behalf, was required to appear as a witness with both wrist and ankle restraints, thereby damaging his credibility as a witness." *(People* v. *Duran, supra,* 16 Cal.3d at p. 296.) The jury also was not instructed to disregard any negative implications the shackling might have had on the presumption of innocence.

The record in this case depicts a considerably different picture. ▆▆ First, defendant did not testify at either phase of the trial; nor is there evidence he would have testified but for his restraints. Second, in *Duran* the defendant was heavily manacled at both his ankles and wrists; here, defendant was either handcuffed by one wrist to his chair or placed in a leg brace designed to impair his mobility. (See *People* v. *Duran, supra,* 16 Cal.3d at p. 291, fn. 9.) More significantly, the jurors apparently were never aware of either form of restraint. The court directed they be brought in and out of court while defendant was seated with his shackles concealed and took continuous precautions to assure they remained ignorant of the situation. The defense never brought to the court's attention any evidence to the contrary.

Under such circumstances, we fault only the failure to establish on the record a manifest need for restraints; the procedures implemented could not have influenced either the guilt or penalty verdict. "[A]ny error was clearly harmless." *(People* v. *Allen* (1986) 42 Cal.3d 1222, 1264 [25 L.Ed.2d 353,

359, 90 S.Ct. 1057]; see also *People* v. *Sheldon* (1989) 48 Cal.3d 935, 946 [258 Cal.Rptr. 242, 771 P.2d 1330].)

## 2. *Defendant's Absence From In Camera Hearing*

Defendant also asserts he was improperly excluded from the in camera hearing because his presence was "required in order to protect [his] interests, [and] to assure him a fair and impartial trial . . . ." (*People* v. *Jackson* (1980) 28 Cal.3d 264, 310 [168 Cal.Rptr. 603, 618 P.2d 149]; see generally §§ 977, subd. (b), 1043, subd. (a).) This argument simply recasts defendant's fundamental complaint that the trial court abused its discretion in ordering him shackled. Under the facts, we need not resolve the question of whether the presence of an accused at such a hearing "bears a 'reasonably substantial relation to the fullness of his opportunity to defend against the charge.' [Citation.]" (*In re Lessard* (1965) 62 Cal.2d 497, 506 [42 Cal.Rptr. 583, 399 P.2d 39].) Any error in the court's decision was harmless and remains so irrespective of defendant's absence from some portion of the proceedings.

## 3. *Defense Counsel's "Conflict of Interest"*

During the in camera hearing, defendant's attorney indicated, "[T]his does not constitute a conflict because any attorney representing Mr. Cox would be privy to this information. [¶] In our investigation of the case there—we think that there is some possibility that there may be an escape attempt in this case." ▉ Defendant asserts the court should have pursued this revelation to assure he was represented by "conflict free" counsel or obtained his express waiver of such representation.

▉ "Included in the right to effective assistance of counsel is 'a correlative right to representation that is free from conflicts of interest.' [Citations.]" (*People* v. *Bonin* (1989) 47 Cal.3d 808, 834 [250 Cal.Rptr. 687, 758 P.2d 1217].) As a general proposition, such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests. [Citation.]" (*Id.*, at p. 835.)

"In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." (*Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 348 [64 L.Ed.2d 333, 346-347, 100 S.Ct. 1708], fn. omitted.) To meet this burden, *Sullivan* mandates a defendant "show[] that his counsel actively represented conflicting interests"; "the *possibility* of conflict is insufficient to impugn a criminal conviction." (*Id.*, at p. 350 [64

L.Ed.2d at pp. 347-348], italics added.) Under our state Constitution, "[w]e have applied a somewhat more rigorous standard of review." (*People* v. *Mroczko* (1983) 35 Cal.3d 86, 104 [197 Cal.Rptr. 52, 672 P.2d 835].) Regardless of an objection, "even a potential conflict may require reversal if the record supports 'an informed speculation' that appellant's right to effective representation was prejudicially affected. Proof of an 'actual conflict' is not required." (*Id.*, at p. 105.)

Defendant relies on cases in which potential or actual conflict resulted from the defense attorney's simultaneous representation of a codefendant or witness whose position relative to the charges was adverse to the defendant's interests. (See *People* v. *Easley* (1988) 46 Cal.3d 712, 720-724 [250 Cal.Rptr. 855, 759 P.2d 490] [defense counsel also represented owner of property destroyed by fire who testified for prosecution regarding defendant's participation in arson alleged as violent-crime special circumstance]; *People* v. *Mroczko, supra,* 35 Cal.3d at pp. 103-108 [same attorney represented defendant and codefendant who had antagonistic defenses because of differing degrees of culpability]; see also *Wheat* v. *United States* (1988) 486 U.S. 153, 155-158 [100 L.Ed.2d 140, 146-148, 108 S.Ct. 1692] [same attorney represented defendant and prosecution witness whom attorney would be precluded from effectively cross-examining; defendant not permitted to waive conflict]; *Cuyler* v. *Sullivan, supra,* 446 U.S. at p. 350 [64 L.Ed.2d at p. 348] [defense attorneys rested defendant's case to avoid exposing witnesses who might later testify for codefendants they also represented; remanded for determination of actual conflict and absence of tactical decision].)

 We find nothing in defendant's situation comparable to the facts of these cases. Whatever "conflict" trial counsel was referring to does not appear of record and was never alluded to again. It clearly did not involve dual representation; defendant fails to suggest any other reason, actual or potential, that might cause his attorney to compromise his defense. Under such circumstances, we find no basis for requiring the trial court to inquire further or secure a waiver of conflict. (See *Wood* v. *Georgia* (1981) 450 U.S. 261, 272-273 [67 L.Ed.2d 220, 231, 101 S.Ct. 1097].)

Parenthetically, we also observe that the American Bar Association Code of Professional Responsibility permits an attorney to reveal "[t]he intention of his client to commit a crime and the information necessary to prevent the crime." (DR 4-101(C)(3); see also ABA Model Rules Prof. Conduct, rule 1.6(b)(1) [attorney may reveal confidential information "to prevent the client from committing a criminal act . . . likely to result in imminent death or substantial bodily harm"]; cf. Evid. Code, § 956 [no attorney-client privilege "if the services of the lawyer were sought or obtained to enable or aid

anyone to commit or plan to commit a crime"]; see generally *Matter of Shay* (1911) 160 Cal. 399, 406 [117 P. 442]; *Falloon* v. *Superior Court* (1926) 79 Cal.App. 149, 157-158 [248 P. 1057].) The Model Rules of Professional Conduct also admonish against knowingly "fail[ing] to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client . . . ." (ABA Model Code Prof. Conduct, rule 3.3(a)(2).) Under most circumstances, this obligation would include alerting the court to matters that might threaten the security of the proceedings.

### 4. *Failure to Instruct*

██ In instructing the jury, the court did not mention the restraints but simply cautioned the panel not to be "biased against the defendant because he has been arrested for this offense, or because he has been charged with a crime, or because he has been brought to trial." (CALJIC No. 1.00 (1979 rev.).) Defendant contends the court had a sua sponte obligation to amplify on this admonition with specific reference to his shackles.

In *People* v. *Duran, supra,* we advised that "when the restraints are concealed from the jury's view, this instruction should not be given unless requested by defendant since it might invite initial attention to the restraints and thus create prejudice which would otherwise be avoided." (16 Cal.3d at p. 292, fn. omitted; *People* v. *Allen, supra,* 42 Cal.3d at p. 1265, fn. 25; see also *People* v. *Sheldon, supra,* 48 Cal.3d at p. 946.) Having determined the record contains no evidence the jury saw defendant's shackles, we conclude the court had no duty to instruct on the matter in the absence of a specific request.

### B. *Ineffective Assistance of Counsel*[5]

Defendant makes numerous assertions of ineffective assistance of counsel. Before addressing them individually, we review the basic principles that inform and guide our assessment of these issues on appeal:

██ We begin with the general proposition that "the burden of proving a claim of inadequate trial assistance is on the appellant. [Citation.]"

---

[5] At both the guilt and penalty phases of the trial, defendant was represented by Edward M. Cook and Joanne Rotstein. Both counsel participated fully and coextensively in presenting the defense: examining witnesses, arguing motions, and making penalty phase argument. Accordingly, throughout the remainder of the calendar, most references to "counsel" will designate both attorneys collectively. Some issues other than ineffective assistance of counsel involve one attorney or the other. In those instances, the gender reference should identify the individual actually participating in the proceedings at that point.

(*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Thereafter, " '[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.' [Citations.] 'First, the defendant must show that counsel's performance was deficient.' [Citations.] Specifically, he must establish that 'counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.] . . . [¶] In addition to showing that counsel's performance was deficient, a criminal defendant must also establish prejudice before he can obtain relief on an ineffective-assistance claim." (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216, 217 [233 Cal.Rptr. 404, 729 P.2d 839], citing and quoting *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688, 691-692 [80 L.Ed.2d 674, 693, 696, 104 S.Ct. 2052].)

██ With respect to evaluating the performance component, "[m]erely tactical errors by counsel are not deemed reversible [citation], for the decisions of counsel in the midst of trial cannot be second-guessed by the hindsight of an appellate court [citation]." (*People* v. *Frausto* (1982) 135 Cal.App.3d 129, 139 [185 Cal.Rptr. 314].) Moreover, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 690 [80 L.Ed.2d at p. 695].) ██ As to the prejudice component, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.,* at p. 694 [80 L.Ed.2d at p. 698].) Moreover, "prejudice must be affirmatively proved. [Citations.] 'It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . .' [Citations.]" (*People* v. *Ledesma, supra,* 43 Cal.3d at pp. 217-218.)

Finally, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order [set forth above] or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 697 [80 L.Ed.2d at p. 699].)

### 1. *Failure to Challenge Jury Venire*

██ Citing *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433], defendant contends counsel should have challenged the method

of selecting the jury venire. In *Harris*, a plurality of this court found that statistical evidence of systematic underrepresentation of Blacks and Hispanics in the jury pool resulting from the use of voter registration lists violated the Sixth Amendment right to trial by a fair cross-section of the community. (*Id.*, at pp. 58-59; see generally *Duren* v. *Missouri* (1979) 439 U.S. 357 [58 L.Ed.2d 579, 99 S.Ct. 664]; but see *People* v. *Sanders* (1990) 51 Cal.3d 471, 493-495 [273 Cal.Rptr. 537, 797 P.2d 561].) Defendant argues that because *Harris* arose in Los Angeles County and our decision antedated his trial by several months, counsel erred in not moving to quash the jury venire.

In *Williams* v. *Superior Court* (1989) 49 Cal.3d 736 [263 Cal.Rptr. 503, 781 P.2d 537], we determined "that the appropriate definition of community for cross-section analysis is the judicial district." (*Id.*, at p. 739, fn. omitted.) The relevant statistics in *Harris* related to "Long Beach Superior Court jury panels from May 5 through August 15, 1979[,]" i.e., the Long Beach Judicial District. (*People* v. *Harris, supra*, 36 Cal.3d at p. 46.) Defendant's trial took place in the Los Angeles Judicial District; hence, the result in *Harris* is irrelevant. More to the point, "[t]here is no indication in the record that defendant was either deprived of a representative jury or that counsel's failure to challenge the jury venire was unreasonable within the meaning of either *Pope, supra*, . . . or [*People* v.] *Fosselman* [(1983) 33 Cal.3d 572] . . . ." (*People* v. *Moore* (1988) 47 Cal.3d 63, 86 [252 Cal.Rptr. 494, 762 P.2d 1218].) In the absence of such data, we are unable to determine whether he could have met his burden of showing "that the representation of the excluded group[s] in venires from which juries [were] selected [was] not 'fair and reasonable in relation to the number of such persons in the community.'" (*Williams* v. *Superior Court, supra*, 49 Cal.3d at p. 746, quoting *Duren* v. *Missouri, supra*, 439 U.S. at p. 364 [58 L.Ed.2d at p. 587].) Without some basis for evaluating the likely success of a motion to quash, we cannot conclude defendant suffered any prejudice.[6] Moreover, in light of *Williams*, we are reluctant even to imply counsel should have considered such a motion.

### 2. *Death Qualification Voir Dire*[7]

Defendant also complains that his attorneys' perfunctory participation in the "death qualification" process failed to afford him effective assistance since counsel was thus unable to probe attitudes toward capital

---

[6]Indeed, "[d]efendant does not argue that he was deprived of a representative jury on this point, but simply that counsel's failure to move to quash the jury venire is another indication of inadequate performance." (*People* v. *Moore, supra*, 47 Cal.3d at p. 85.)

[7]See, *ante*, footnote 5. Both Cook and Rotstein participated in voir dire. However, only Cook argued the motion to restrict the "death qualification" questioning.

punishment and eliminate potential death-prone jurors. (See Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases* (1983) 58 N.Y.U. L. Rev. 299, 325-326.) However, he has not demonstrated that the manner of conducting this portion of voir dire resulted from other than an informed strategic decision. Because we cannot conclude that choice was unreasonable "from counsel's perspective at the time," we are bound by the "highly deferential" standard of judicial scrutiny applicable under the circumstances. (*Strickland* v. *Washington, supra,* 466 U.S. at p. 689 [80 L.Ed.2d at pp. 694-695].)

Prior to commencement of the sequestered voir dire, the defense attempted to limit substantially the nature and extent of inquiry into prospective jurors' general attitudes toward the death penalty. Counsel proffered the following rationale for the requested restrictions: When the United States Supreme Court decided *Witherspoon* (1969), popular opinion was essentially evenly divided on the death penalty, with a slight majority opposed. (See *Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 520, fn. 16 [20 L.Ed.2d at p. 783].) At the time of defendant's trial (1985), however, that sentiment had shifted dramatically; according to counsel's statistics, 80 percent then favored capital punishment. (See also *Gregg* v. *Georgia* (1976) 428 U.S. 153, 181, fn. 25 [49 L.Ed.2d 859, 879, 96 S.Ct. 2909].) If the prosecutor were permitted to engage in extensive voir dire, he would be able easily to identify, and hence readily eliminate, all venirepersons who entertained some conscientious or religious scruples even if they otherwise affirmed their ability to follow the law and impose a death sentence. With each side having the same number of peremptory challenges, "just [as] a matter of percentages," the prosecution would be able to control the composition of the jury to include only those who, as a general proposition, favored the death penalty and to excuse those who did not, all contrary to the mandate of *Witherspoon.*

Counsel alluded to a capital case he had tried the previous year in which he felt this exact scenario had come to pass. While the court did not question the statistical basis for the motion, it was unconvinced of the underlying legal premises and indicated an intent to allow a moderate degree of inquiry by both sides. The defense subsequently questioned all prospective jurors but did not engage in "probing" inquiry except in response to some of the prosecutor's challenges for cause. Under the circumstances, we can reasonably infer the decision to pursue this course was a tactical choice to avoid revealing too much, thereby enabling the prosecutor to identify and excuse by peremptory challenge those who expressed scruples about imposing the death penalty.

We do not find this professional judgment ill-considered or strategically untenable. (See also *People* v. *Lewis* (1990) 50 Cal.3d 262, 289-290 [266

Cal.Rptr. 834, 786 P.2d 892]; see generally *People* v. *Wright* (1990) 52 Cal.3d 367, 413-414 [276 Cal.Rptr. 731, 802 P.2d 221].) Whatever different approach might have been available, we are not in a position on this record to fault the one chosen. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Citation.]" (*Strickland* v. *Washington, supra,* 466 U.S. at pp. 689-690 [80 L.Ed.2d at p. 695], citing Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, supra,* 58 N.Y.U. L. Rev. 299, 343; see *People* v. *Ledesma, supra,* 43 Cal.3d at p. 216.) ■■ "Reviewing courts will reverse on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659 P.2d 1144].) Other than by speculation and "the distorting effects of hindsight" (*Strickland* v. *Washington, supra,* 466 U.S. at p. 689 [80 L.Ed.2d at p. 694]), defendant has failed to meet this burden. (See, e.g., *People* v. *Williams* (1988) 44 Cal.3d 883, 937 [245 Cal.Rptr. 336, 751 P.2d 395] [defendant must establish more favorable result likely as " 'demonstrable reality,' not simply speculation"].) Parenthetically, we also express doubt as to whether a protracted voir dire would have produced a more favorable result. (Cf. *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1082-1087 [259 Cal.Rptr. 630, 774 P.2d 659] [prejudice resulting from improper restriction on voir dire measured by whether it "affected defendant's right to a fair and impartial jury."]; *People* v. *Coleman, supra,* 46 Cal.3d at p. 768 [erroneous ruling on challenge for cause harmless since it "did not result in a jury particularly apt to impose the death penalty"].)

### 3. *Request to Have Defendant Shackled During Trial; Exclusion of Defendant From In Camera Hearing*

■■ Adverting again to his shackling at trial, defendant lays partial blame on his counsel for requesting the restraints absent some indication the court found them necessary. He also contends counsel was ineffective for excluding him from the in camera hearing at which the matter was initially raised.

As previously discussed, defendant did not suffer any impairment of his right to a fair trial by being physically restrained during the proceedings. Hence, any error in ordering the restraints or conducting the in camera hearing, whether on the part of the court or counsel or both, does not warrant reversal of either the conviction or sentence. (*People* v. *Ledesma, supra,* 43 Cal.3d at p. 217; cf. *People* v. *Hamilton* (1985) 41 Cal.3d 408, 424 [221 Cal.Rptr. 902, 710 P.2d 981] ["Although fault might be found with

counsel's reasoning in requesting shackling in the first instance . . . , the matter became moot" when manifest need arose.].)

### 4. *Eliciting Testimony of Gang Affiliation*

■ During cross-examination of James Kennedy, counsel inquired into defendant's involvement in gang activity. Counsel also raised the subject of prison gangs in questioning Joey Upland about conditions of incarceration. Defendant contends these "devastating" lines of inquiry prejudiced his defense at both the guilt and penalty phases because the evidence unfavorably portrayed him as an intransigently violent person.

When offered by the prosecution, we have condemned the introduction of evidence of gang membership if only tangentially relevant, given its highly inflammatory impact. (See generally *People* v. *Cardenas* (1982) 31 Cal.3d 897, 904-905 [184 Cal.Rptr. 165, 647 P.2d 569]; see also *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 450, fn. 8 [204 Cal.Rptr. 700, 683 P.2d 699].) On the other hand, the defense may be pursuing a legitimate strategy in placing such information before the jury. For example, in *People* v. *Frausto, supra,* 135 Cal.App.3d 129, counsel had a "tactical reason" for not objecting to testimony of gangs and gang-related activity that "showed the victim and his companions in an unfavorable light because of the definite admission of the victim that he was a gang member in another gang's territory. As such, evidence of gangs was a twin sword which could be utilized by the defense in attacking the credibility of the victim." (*Id.,* at p. 141.)

Here, we perceive a different but equally reasonable tactical decision in broaching the subject. As discussed more fully below, counsel's strategy was to forgo a strenuous guilt phase attack and focus the jury's attention at the penalty phase on possible lingering doubt over the identity of the actual killer. Crucial support for this theory lay in depicting defendant as a "follower," who operated under the influence and at the direction of more sophisticated and dominant gang members such as Darren Williams. During the penalty phase, counsel emphasized this point several times, alluding as well to the pervasive gang activity and attendant peer pressure in defendant's neighborhood while he was growing up. As a gang member himself, Kennedy's testimony enhanced the credibility of this argument. Upland's testimony also provided the foundation for the claim that life in prison without possibility of parole would be a "horrible punishment," sufficient to redress defendant's moral culpability.

Given the few viable appeals for clemency, we cannot fault the defense strategy or find any deficiency in its implementation. (Cf. *People* v. *Miranda, supra,* 44 Cal.3d at pp. 119-121 [decision *not* to introduce

evidence of defendant's long-standing gang involvement was reasonable tactical choice given possibility of damaging cross-examination and rebuttal testimony].) Defendant has failed to meet his threshold burden on this issue.

5. *Failure to Present Guilt Phase Defense or Argument as to Lesser Degree of Culpability*

 The defense offered no evidence at the guilt phase. At the conclusion of the prosecutor's argument, counsel also declined to present any response, specifically affirming that the decision was for "strategic or tactical purposes" and that defendant was not "at odds" with the choice. (See *People* v. *Frierson* (1985) 39 Cal.3d 803, 815-816 [218 Cal.Rptr. 73, 705 P.2d 396].) Defendant now contends counsel rendered ineffective assistance because the evidence supported a finding that he was guilty of only second degree murder or merely aiding and abetting an assault. He also suggests his attorneys should have cross-examined prosecution witnesses more rigorously and could have presented evidence that he did not share the killer's intent. (See *People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].)

We do not find counsel's tactical choices constitutionally lacking under the circumstances. In resolving claims of ineffective assistance, we must "assess counsel's overall performance throughout the case" (*Kimmelman* v. *Morrison* (1986) 477 U.S. 365, 386 [91 L.Ed.2d 305, 326, 106 S.Ct. 2574]), evaluating it "from counsel's perspective at the time of the alleged error and in light of all the circumstances. [Citation.]" (*Id.*, at p. 384 [91 L.Ed.2d at p. 325].) As experienced criminal attorneys, defense counsel pragmatically recognized that the evidence established the callously calculated murders of four innocent and unsuspecting victims for which defendant was directly responsible. In formulating a guilt phase strategy, they could reasonably have anticipated eventually having to conduct a penalty phase as well. Apparently, counsel determined the strongest defense against a death sentence was to portray Williams as the mastermind, who "orchestrated" the killings and "was in control" of events, while defendant, younger and more susceptible to peer pressure, simply accompanied him in a subservient role without prior knowledge of his precise purpose.

Although counsel could have made this argument at the guilt phase, the likelihood of reducing defendant's culpability for special circumstance murder was minimal given the compelling evidence of his involvement at least as an aider and abettor. Asking the jurors to pass upon this theory at an early stage may well have diluted its credibility and hardened their attitudes even before the penalty phase began. (See, e.g., *People* v. *Jackson, supra,* 28 Cal.3d at pp. 290, 295.) Indeed, had the jury rejected this theory as to guilt,

they implicitly would have already concluded defendant was the actual killer, leaving the defense in a greatly weakened position in appealing for life over death. Thus, counsel may have reasonably determined that their efforts would be best applied to mitigating the penalty. (See, e.g., *People* v. *Rich* (1988) 45 Cal.3d 1036, 1097-1998 [248 Cal.Rptr. 510, 755 P.2d 960]; *People* v. *Jackson, supra,* 28 Cal.3d at pp. 292-293; but see *People* v. *Frierson, supra,* 39 Cal.3d at pp. 814-815 [counsel cannot "refuse to honor defendant's clearly expressed desire to present a defense" at guilt/special circumstances phase of trial].)

Through a selective reading of the record with considerable hindsight, defendant speculates a more favorable determination would have resulted from other possible courses; yet he has failed to establish as a demonstrable reality any professional lapse in the defense actually employed. (*People* v. *Pope, supra,* 23 Cal.3d at p. 426.) Lack of success does not reflect incompetence of counsel. (*Strickland* v. *Washington, supra,* 466 U.S. at p. 689 [80 L.Ed.2d at p. 694]; see also *People* v. *Jackson, supra,* 28 Cal.3d at pp. 288-289.) Indeed, as the court observed at the close of trial, "I believe on the evidence presented in this case the same outcome would result no matter what the trial strategy or tactics that might be employed by the defense." (See *People* v. *Fosselman, supra,* 33 Cal.3d at p. 582.)

As to whether certain witnesses should have been more rigorously cross-examined, such matters are normally left to counsel's discretion and rarely implicate inadequacy of representation. (See, e.g., *People* v. *Robertson* (1989) 48 Cal.3d 18, 41 [255 Cal.Rptr. 631, 767 P.2d 1109]; *People* v. *Murphy* (1972) 8 Cal.3d 349, 366-367 [105 Cal.Rptr. 138, 503 P.2d 594]; *People* v. *Beagle* (1972) 6 Cal.3d 441, 458 [99 Cal.Rptr. 313, 492 P.2d 1].)[8] Defendant identifies no exculpatory or impeachment evidence that counsel could have revealed by further questioning of prosecution witnesses and that would have produced a more favorable result at trial.

■ The record also does not sustain the purported failure to present extenuating evidence of intent. Such claims must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused. (See, e.g., *In re Hall* (1981) 30 Cal.3d 408 [179 Cal.Rptr. 223, 637 P.2d 690]; see also *People* v. *Jackson, supra,* 28 Cal.3d at pp. 294-296.) We cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation.

---

[8]Moreover, to the extent the assertion relies on statements made by witnesses at the codefendants' trials, that evidence is not contained in the record or otherwise subject to our examination on appeal.

### 6. *Cumulative Effect*

■ Defendant has failed to meet his burden of establishing inadequate representation and resulting prejudice as to each claim of ineffective assistance of counsel. Accordingly, we can find no cumulative deficiency assessing these contentions in the aggregate. Nor does the record suggest in any respect a "breakdown in the adversarial process that our system counts on to produce just results." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 696 [80 L.Ed.2d at p. 699].)

### C. *Testimony of Family Members and Admission of Photographs of Victims in Life*

Over defendant's objection at the guilt phase, the prosecution called as a witness Ebora Alexander's son Kermit, a former college and professional football player well known in Los Angeles. He identified life photographs of his mother and sister and also testified he had never seen defendant at his mother's house. Defendant also objected when the mothers of Damani Garner and Damon Bonner identified their sons from life pictures. They similarly denied ever seeing defendant at the Alexander residence. ■■■■ ■ According to defendant, none of the witnesses should have testified because he offered to stipulate to the matters contained in their testimony and their presence imparted undue emotional impact to the proceedings.[9] (See *People* v. *Hall* (1980) 28 Cal.3d 143, 152 [167 Cal.Rptr. 844, 616 P.2d 826], disapproved on other grounds in *People* v. *Valentine* (1986) 42 Cal.3d 170, 181 [228 Cal.Rptr. 25, 720 P.2d 913].)

Defendant's claim has limited merit: "There was no dispute as to the identity of the person[s] killed—evidently the only issue on which the

---

[9] Defendant also contends the photographs of the victims in life and the testimony of family members violated his Eighth Amendment right to an individualized determination of his moral culpability, contrary to the dictates of *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], decided subsequent to his trial. In *Booth* the Supreme Court condemned the use of a victim impact statement during the penalty phase because it unduly focused the jury's determination of the appropriate sentence on the character of the victims and the subsequent trauma suffered by their bereaved relatives, which "factors may be wholly unrelated to the blameworthiness of a particular defendant." (*Id.,* at p. 504 [96 L.Ed.2d at p. 449].) Consequently, this evidence could improperly "divert the jury's attention away from the defendant's background and record, and the circumstances of the crime." (*Id.,* at p. 505 [96 L.Ed.2d at p. 450].)

Without deciding whether the Eighth Amendment concerns articulated in *Booth* apply to the guilt phase of a capital offense trial (cf. *Beck* v. *Alabama* (1980) 447 U.S. 625, 642 [65 L.Ed.2d 392, 405-406, 100 S.Ct. 2382]), we do not find them implicated by the appearance of the victims' relatives in this case. The testimony of all three witnesses was brief and factual. They related no information concerning the character of any of the decedents or the impact of their deaths. No improper influence on the jury's guilt or penalty deliberations appears of record.

photograph[s were] relevant—and therefore the photograph[s] should have been excluded because [they] bore on no contested issue. [Citation.] The error, however, must be deemed harmless. 'As we have seen, from the evidence presented at the guilt phase this was not a "close case" in which the jury's sympathy for the victim[s] may have led it to improperly convict [defendant]; the evidence of defendant's participation in the crimes was clear and uncontradicted. Accordingly, the admission of the photograph[s] does not warrant reversal.' [Citation.]"[10] (*People* v. *Hendricks* (1987) 43 Cal.3d 584, 594-595 [238 Cal.Rptr. 66, 737 P.2d 1350], citing and quoting *People* v. *Ramos* (1982) 30 Cal.3d 553, 577-578 [180 Cal.Rptr. 266, 639 P.2d 908], revd. on other grounds *sub nom. California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446].)

The trial court did not abuse its discretion in rejecting a proffered stipulation that none of the witnesses had seen defendant at their mother's house before the killings. ■ To preserve this issue for review, a defendant must specify in sufficient detail the substance of any proposed agreement on facts. (See *Harris* v. *Spinali Auto Sales, Inc.* (1966) 240 Cal.App.2d 447, 452 [49 Cal.Rptr. 610]; see also *Stow* v. *Superior Court* (1918) 178 Cal. 140, 143 [172 P. 598].) Otherwise, the trial court cannot determine whether the prosecution is obligated to accept the stipulation, and the appellate court cannot evaluate its exercise of discretion. (See, e.g., *People* v. *Bonin, supra,* 47 Cal.3d at p. 848.)

■ Here, counsel did not actually offer to stipulate that defendant had never been in the Alexander house or, at the very least, did not specify the factual matters he would admit. When considered in context, the willingness to stipulate clearly applied to the identification of the victims from their photographs in life and nothing else potentially in dispute. Since crucial aspects of the prosecution's case turned on the presence of defendant's palm print on the trunk in the victims' bedroom, any relevant admission would have to incorporate the theory that it was placed there the day of the murders. Without a proposed stipulation, we cannot assess whether it might have been so "ambiguous in form or limited in scope" as to deprive the prosecution "of the legitimate force and effect of material evidence" (*Fuentes* v. *Tucker* (1947) 31 Cal.2d 1, 7 [187 P.2d 752]; see also *People* v. *Brown* (1988) 45 Cal.3d 1247, 1262 [248 Cal.Rptr. 817, 756 P.2d 204]) or to "hamper a coherent presentation of the evidence . . . ."[11] (*People* v. *Hall,*

---

[10] The photographs of all the victims, "though perhaps 'charming,' [were] nonetheless . . . 'ordinary' one[s] not likely to produce a prejudicial impact." (*People* v. *Hovey* (1988) 44 Cal.3d 543, 571 [244 Cal.Rptr. 121, 749 P.2d 776]; see *People* v. *Poggi* (1988) 45 Cal.3d 306, 323 [246 Cal.Rptr. 886, 753 P.2d 1082]; *People* v. *Thompson* (1988) 45 Cal.3d 86, 115 [246 Cal.Rptr. 245, 753 P.2d 37].)

[11] We also note that the witnesses' testimony "was brief and undramatic" (*People* v. *Brown, supra,* 45 Cal.3d at p. 1262) and "had no potential to inflame the jurors and hence could not have exposed defendant to prejudice." (*People* v. *Bonin, supra,* 47 Cal.3d at p. 849.)

*supra,* 28 Cal.3d at p. 153; cf. Evid. Code, § 354 [no reversal of verdict for erroneous exclusion of evidence except on offer of proof].)

We also find no impropriety in permitting Kermit Alexander to testify. Whatever the witness's "celebrity" status, nothing in the record suggests any sympathy or other untoward influence engendered by his brief appearance and unemotional testimony. (See *People* v. *Carrera* (1989) 49 Cal.3d 291, 330-331 [261 Cal.Rptr. 348, 777 P.2d 121].) We decline to formulate a rule of admissibility premised on the extent to which a witness may or may not otherwise be known to the general public. (Cf. *ibid.* [declining to presume prejudice from testimony of murder victim's parent].)

### D. *Autopsy Photographs*

██ Defendant objected to the introduction of nine photographs depicting the entrance and exit wounds suffered by the victims as irrelevant or insufficiently probative of any disputed issue given their prejudicial impact. The prosecutor explained that the evidence illustrated the manner in which the killings took place and substantiated the theory of deliberation and premeditation, i.e., that defendant entered the Alexander residence with the intent to eliminate everyone in it as quickly as possible. The photo of Ebora Alexander, which showed the extent of her head wound, also corroborated defendant's statement, "I just blew the bitch's head off."

"We have repeatedly stated that the court has wide discretion in determining the admissibility of photographs of a murder victim. [Citations.] We have previously held that a court may admit even 'gruesome' photographs if the evidence is highly relevant to the issues raised by the facts . . . . [Citation.] However, when a defendant objects that the proffered evidence is more prejudicial that probative, the record must affirmatively show that the court weighed these factors, in order to allow proper appellate review of abuse of discretion claims. [Citation.]" (*People* v. *Coleman, supra,* 46 Cal.3d at p. 776.)

The trial court carefully considered the proffered justification in light of defendant's objections under Evidence Code section 352. Although one picture of Ebora "appear[ed] to be close to the concept of being factually gruesome," the court concluded, "I don't believe that [one] will inflame the passions of the jury. It is certainly not pretty [to] look at, nor are any of the other photographs pretty to look at, certainly, but I do believe that in light of the statement and the mode and manner that these killings occurred, and for the reasons stated by the prosecution, that they do have probative value that outweighs any prejudicial effect from them . . . ."

This record reflects a proper exercise of discretion. (See *People* v. *Green* (1980) 27 Cal.3d 1, 24-25 [164 Cal.Rptr. 1, 609 P.2d 468], disapproved on other grounds in *People* v. *Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99].) We have consistently upheld the introduction of autopsy photographs disclosing the manner in which a victim was wounded as relevant not only to the question of deliberation and premeditation but also aggravation of the crime and the appropriate penalty, all of which were at issue here. (See *People* v. *Thompson* (1990) 50 Cal.3d 134, 182 [266 Cal.Rptr. 309, 785 P.2d 857]; *People* v. *Carrera, supra,* 49 Cal.3d at p. 329; *People* v. *Milner* (1988) 45 Cal.3d 227, 247 [246 Cal.Rptr. 713, 753 P.2d 669]; *People* v. *Melton* (1988) 44 Cal.3d 713, 741 [244 Cal.Rptr. 867, 750 P.2d 741].) The facts also substantiate the corroborative effect of Ebora Alexander's picture in establishing defendant as the main perpetrator of the crimes. (See *People* v. *Milner, supra,* 45 Cal.3d at p. 247.)

Moreover, having examined the photographs, we agree with the trial court's assessment of their likely prejudicial impact and probative value. They "are relatively small and, although quite unpleasant to view, they are not exceptionally gruesome. . . . [U]nlike the photographs in some cases, these . . . do not show the victim[s'] bodies in a badly decomposed condition [citation] or after they have been grossly disfigured during autopsy. [Citations.]" (*People* v. *Allen, supra,* 42 Cal.3d at pp. 1257-1258, fn. omitted; see also *People* v. *Carrera, supra,* 49 Cal.3d at p. 329.) The prosecutor also did not include some pictures apparently depicting Ebora Alexander's wound in more graphic detail. (See *People* v. *Thompson, supra,* 45 Cal.3d at p. 114; *People* v. *Allen, supra,* 42 Cal.3d at p. 1258.) Defendant has thus failed to demonstrate a manifest abuse of discretion in the admission of this evidence. (*People* v. *Harris* (1989) 47 Cal.3d 1047, 1095 [255 Cal.Rptr. 352, 767 P.2d 619].)

### E. *Instructions*

#### 1. *Accomplices—CALJIC No. 2.11.5*

Given the extent of Moore's and Brown's involvement, the trial court gave a full panoply of aiding and abetting and accomplice instructions.[12] The court also instructed the jury pursuant to CALJIC No. 2.11.5 as

---

[12] The relevant instructions included the following: CALJIC Nos. 3.00 (1984 rev.) (principals defined), 3.01 (1984 rev.) (aiding and abetting defined), 3.02 (1979 rev.) (termination of liability of aider and abettor), 3.10 (1984 rev.) (accomplice defined), 3.11 (1979 rev.) (testimony of accomplice must be corroborated), 3.12 (1979 rev.) (sufficiency of evidence to corroborate accomplice), 3.13 (1979 rev.) (one accomplice may not corroborate another), 3.14 (rev.) (criminal intent necessary for accomplice), 3.18 (1979 rev.) (testimony of accomplice to be viewed with distrust), 3.19 (1979 rev.) (burden to prove corroborating witness is accomplice).

follows: "There has been evidence in this case indicating that persons other than defendant were or may have been involved in the crime for which the defendant is on trial. [¶] You must not discuss or give any consideration as to why the other persons are not being prosecuted in this trial or whether they have been or will be prosecuted." ▆▆▆ Defendant argues the jury was fatally confused and misled because it was directed both to resolve the status of Moore and Brown as principals or accomplices in evaluating their testimony and to disregard the criminal liability of other participants.

Defendant correctly contends that, as a general proposition, the trial court should not have given CALJIC No. 2.11.5 under the circumstances. (But see, *post*, fn. 13.) As the Use Note reflects and this court has reaffirmed: "This instruction is not to be used if the other person is a witness for either the prosecution or the defense." (See *People* v. *Marks* (1988) 45 Cal.3d 1335, 1347 [248 Cal.Rptr. 874, 756 P.2d 260]; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1313 [248 Cal.Rptr. 834, 756 P.2d 221].) Nevertheless, any error was not prejudicial.

▆▆▆ "In determining whether an instruction interferes with the jury's consideration of evidence presented at trial, we must determine 'what a reasonable juror could have understood the charge as meaning.' [Citation.] While the initial focus is on the specific instruction challenged [citation], we must also review the instructions as a whole to see if the entire charge delivered a correct interpretation of law. [Citation.]" (*People* v. *Garrison* (1989) 47 Cal.3d 746, 780 [254 Cal.Rptr. 257, 765 P.2d 419].) ▆▆▆ Here, the court specified that the instructions on accomplice liability and the restrictions on assessing the weight and credibility of accomplice testimony applied to Moore and Brown; whereas, CALJIC No. 2.11.5 "was patently directed at" Burns and Williams, defendant's absent confederates.[13] (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 783 [248 Cal.Rptr. 126, 755 P.2d 310].)

The court also charged the jury not to single out any instruction (CALJIC No. 1.01) and to consider the full range of factors affecting credibility (CALJIC No. 2.20). In this context, we conclude "a reasonable juror would continue to act in accordance with the court's charge on accomplice testimony, but would simply refrain from discussing or giving any consideration to the separate issue why [Moore and Brown were] not being prosecuted in the present action or whether [they] had been or would be prosecuted . . . ." (*People* v. *Williams, supra,* 45 Cal.3d at p. 1313; see *People* v.

---

[13] For this reason, "[t]here would have been no problem in giving the instruction here had the trial court modified it to limit its application to [Burns and Williams] and why [they were] not being prosecuted in defendant's trial." (*People* v. *Carrera, supra,* 49 Cal.3d at p. 312, fn. 10.)

*Carrera, supra,* 49 Cal.3d at p. 313; *People* v. *Sheldon, supra,* 48 Cal.3d at pp. 947-948; *People* v. *Belmontes, supra,* 45 Cal.3d at p. 783.)

Furthermore, we find no inherent contradiction in requiring the jurors to determine the accomplice liability of these witnesses in assessing the weight of their testimony and also directing them to ignore these factors in resolving defendant's guilt. ■ One purpose of the instruction is to focus the jury's attention on an individualized evaluation of the evidence against the person on trial without extraneous concern for the fate of other participants irrespective of their culpability.[14] (See, e.g., *People* v. *Malone* (1988) 47 Cal.3d 1, 51 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People* v. *Williams, supra,* 45 Cal.3d at p. 1313.)

■ Given the totality of the foregoing circumstances, we conclude the omission of the challenged instruction would not in reasonable probability have resulted in a more favorable determination. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### 2. *Aiding and Abetting—CALJIC No. 3.00*

■ The court instructed that one incurs criminal liability for the "natural and reasonable or probable consequences of any act . . . knowingly and intentionally aided or encouraged." (CALJIC No. 3.00 (1984 rev.).) Defendant contends the instruction erroneously failed to include a modification requiring the jury to determine whether the crime charged actually was a "natural and probable consequence" of the act so encouraged. (*People* v. *Hammond* (1986) 181 Cal.App.3d 463, 469 [226 Cal.Rptr. 475]; see CALJIC No. 3.00 (1987 rev.).) He also alleges the error was prejudicial since "under one view of the evidence a properly instructed jury could have determined that defendant was not guilty of murder because, although he had a specific intent to facilitate some criminal conduct (such as assault with a deadly weapon or shooting at an inhabited dwelling), the crime of murder was not a natural and probable consequence of the contemplated crime."

---

[14]Only when a witness has been granted immunity from prosecution or otherwise received favorable treatment in return for testifying should the jury consider any incentive in assessing his or her credibility. (See *People* v. *Carrera, supra,* 49 Cal.3d at p. 312; *People* v. *Sheldon, supra,* 48 Cal.3d at pp. 946-947.) This concern did not arise at defendant's trial, however. The record contains no evidence that Moore or Brown agreed to testify in exchange for prosecutorial leniency or that either sought to avoid possible charges by appearing on behalf of the People. We also note that their testimony was corroborated in all material respects by independent sources. (See *People* v. *Sheldon, supra,* 48 Cal.3d at p. 947; *People* v. *Garrison, supra,* 47 Cal.3d at p. 780.)

This argument is without merit. The modification suggested in *People* v. *Hammond, supra,* 181 Cal.App.3d 463, constitutes a clarification of the jury's fact-finding responsibility, not the delineation of an element of a crime or a form of criminal liability.[15] (See, e.g., *People* v. *Beeman, supra,* 35 Cal.3d at pp. 556-561 [defendant must intend to facilitate criminal act of another as well as to aid its commission with knowledge of perpetrator's purpose].) That is, as worded, the instruction does not withdraw an element from the jury's determination or otherwise interject an impermissible presumption into the deliberative process. (See, e.g., *Pope* v. *Illinois* (1987) 481 U.S. 497 [95 L.Ed.2d 439, 107 S.Ct. 1918]; *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450].)

Under such circumstances, we require the defendant to request further instructional amplification or explanation as he deems necessary. "[E]rror cannot . . . be predicated upon the trial court's failure to give [such amplification or explanation] on its own motion. [Citations.]" (*People* v. *Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].) Moreover, the failure to give a modified instruction could not have affected the outcome. The aiding and abetting theory finds no support in the record; the evidence substantially, if not overwhelmingly, established defendant as the actual perpetrator. Equally insubstantial was any evidence suggesting the assailants intended to scare rather than kill their victims. However, even if defendant meant only to encourage and facilitate an assault with deadly weapons, no reasonable jury would have concluded that the homicides were not a natural and probable consequence of such violence. (See *Rose* v. *Clark* (1986) 478 U.S. 570, 580-581 [92 L.Ed.2d 460, 472, 106 S.Ct. 3101]; see also *People* v. *Dyer* (1988) 45 Cal.3d 26, 65 [246 Cal.Rptr. 209, 753 P.2d 1]; *People* v. *Jones* (1989) 207 Cal.App.3d 1090, 1098 [255 Cal.Rptr. 464].)[16]

---

[15] In *People* v. *Hammond, supra,* the defendant was charged with attempted murder and robbery on a theory of aiding and abetting as the driver of the getaway car. On appeal, he contended the then current version of CALJIC No. 3.00 removed from the jury's consideration whether the charged crime (attempted murder) was a natural and probable consequence of the crime he knowingly and intentionally encouraged and facilitated (robbery). (181 Cal.App.3d at p. 469.) The Court of Appeal agreed some ambiguity existed because "[a]rguably, the language of the instruction suggests that the jury should assume—rather than find—that the attempted murder was a natural and probable consequence of the robbery." (*Ibid.*) Consequently, it concluded "that when, as here, a defendant is charged not only with the perpetrator's planned offense but with another offense ultimately committed as a natural and probable consequence thereof, CALJIC No. 3.00 . . . should be supplemented with an instruction clarifying the jury's related responsibility to determine whether the act committed was in fact a natural and probable consequence of the criminal act knowingly and intentionally encouraged." (*Ibid.*)

[16] Defendant argues at some length that this instructional omission, as a species of *Beeman* error, is reversible per se. In *People* v. *Dyer, supra,* 45 Cal.3d at pages 63-64, however, we determined that *Beeman* error is subject to review under *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. As explained above, any misin-

### F. *Failure to Secure Waiver of Right to Present Defense*

██ Lastly, defendant asserts the failure to present a guilt phase defense or closing argument (*ante*, part III.B.5.) was "tantamount to a guilty plea or to a *Bunnell-Mosley* 'slow plea.' " (See *Bunnell* v. *Superior Court* (1975) 13 Cal.3d 592, 602-605 [119 Cal.Rptr. 302, 531 P.2d 1086]; *In re Mosley* (1970) 1 Cal.3d 913, 922-925 [83 Cal.Rptr. 809, 464 P.2d 473]; see also *Brookhart* v. *Janis* (1966) 384 U.S. 1, 7-8 [16 L.Ed.2d 314, 319, 86 S.Ct. 1245].) The court thus should have secured a waiver of his fundamental constitutional rights before the jury began deliberating. (See generally *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [460 P.2d 449].)

In *People* v. *Hendricks, supra*, 43 Cal.3d 584, "[d]efense counsel presented no opening statement, cross-examined only a few of the prosecution's witnesses and those not extensively, . . . called neither defendant nor any other witnesses, . . . and made no closing argument."[17] (*Id.*, at p. 592.) Writing for a unanimous court, Justice Mosk thoroughly explicated our reasons for not compelling an express waiver under such circumstances: "In *People* v. *Murphy* (1972) 8 Cal.3d 349, 365-366 . . . , we considered and rejected the same contention that defendant raises here—viz., that when counsel elects to present a 'minimal defense' or 'no defense at all,' the court is required to obtain from the defendant a personal, on-the-record waiver of his *Boykin-Tahl* rights. We explained: 'The rationale of *Tahl* and its offspring is to "assure that the record demonstrably discloses the defendant knows of and voluntarily waives the three specified rights . . . surrendered by a guilty plea." [Citations.] The mandate of *Tahl*, however, applies only to pleas of guilty and situations tantamount to a plea of guilty. [Citation.] *Nothing in our decisions following Tahl indicates that the principles expressed therein were intended to apply to jury trials, even where the evidence of guilt is overwhelming.* When a defendant undergoes a jury trial any competent defense counsel will inform him of his right to call witnesses on his own behalf, on his right to testify or not to testify, and, in the absence of

---

struction here was harmless beyond a reasonable doubt given the potentially lethal consequences naturally and reasonably resulting from an assault with deadly weapons.

Moreover, although we need not and do not resolve the issue under the facts of this case, we question the premise that the failure to modify CALJIC No. 3.00 results in an erroneous instruction on the requisite intent for aiding and abetting either by withdrawing that element from the jury's determination or by imposing a conclusive presumption. The rationale of *People* v. *Hammond, supra*, 181 Cal.App.3d 463, was that the jury might find the instruction ambiguous as to the full extent of its fact-finding obligation in assessing intent. This type of instructional error, which does not implicate any constitutional considerations, is traditionally subject to a miscarriage-of-justice standard of review. (*People* v. *Watson, supra*, 46 Cal.2d at p. 836.)

[17]Counsel also stipulated to the admissibility of a confession the defendant had made in an earlier murder trial and to the defendant's two prior murder convictions. (*Id.*, at p. 592.)

unusual circumstances, will cross-examine the witnesses for the prosecution.' [Citations.]

"We implicitly recognized two points in *Murphy*. First, the *Boykin-Tahl* reasoning applies only when the defendant agrees to a submission procedure, such as a guilty plea or a submission on the preliminary hearing transcript, by virtue of which he surrenders one or more of the three specified rights. Second, there is no such surrender when the defendant undergoes—and thereby exercises his right to—a jury trial and has the opportunity to cross-examine the witnesses against him and to refuse to incriminate himself." (*People* v. *Hendricks, supra*, 43 Cal.3d at pp. 592-593; see also *People* v. *Griffin* (1988) 46 Cal.3d 1011, 1029 [251 Cal.Rptr. 643, 761 P.2d 103].)

We also distinguished those cases relied on by defendant: "each involve a submission by virtue of which the defendant surrendered at least his right to a jury trial . . . ." (*People* v. *Hendricks, supra*, 43 Cal.3d at p. 593.) We remain persuaded by this analysis; defendant offers no convincing argument for reexamining our determination under these facts.[18] (See also *People* v. *Murphy, supra*, 8 Cal.3d at pp. 366-367.)

Furthermore, counsel represented that defendant agreed with the chosen strategy. (Cf. *People* v. *Frierson, supra*, 39 Cal.3d at p. 815 [counsel cannot refuse to honor defendant's "clearly expressed desire" to present a defense at guilt/special circumstances phase of trial].) When the record reflects a tactical choice to curtail presentation of defense evidence or closing argument with the defendant's purported knowledge and acquiescence, it would amount to an untoward interference with the attorney-client relationship to suggest the trial court has an obligation to question the defendant as to his concurrence in counsel's trial strategy and to secure a waiver of any rights incidentally relinquished. (Cf. *People* v. *Thomas* (1974) 43 Cal.App.3d 862, 867 [118 Cal.Rptr. 226] [no duty to advise represented defendant of right to testify or not to testify or to explain ramifications of either choice]; *People* v. *Mosqueda* (1970) 5 Cal.App.3d 540, 545 [85 Cal.Rptr. 346] ["[A] trial judge may safely assume that a defendant, who is ably represented and who does not testify is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy; otherwise, the judge would have to conduct a law seminar prior to every criminal trial."].)

---

[18] We also find no evidence supporting a waiver requirement based on allegations of counsel's conflict of interest and failure to pursue a viable defense, which claims we have already reviewed and found lacking. (*Ante*, pts. III.A.3. and III.B.5.)

## IV. PENALTY PHASE ISSUES

### A. *Instructions*

#### 1. *Easley/Boyd Contentions*

At the penalty phase, the trial court directed the jury pursuant to section 190.3 to consider "all of the evidence which has been received during any part of the trial" and "consider, take into account and be guided by" 12 enumerated factors, including "[t]he defendant's character and background" and "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, including evidence which arouses in you sympathy or compassion for the defendant." (See CALJIC No. 8.84.1 (1984 rev.).) Defendant challenges the instruction under *People* v. *Easley* (1983) 34 Cal.3d 858, 875-880 [196 Cal.Rptr. 309, 671 P.2d 813], and *People* v. *Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782], contending it somehow unbalanced the jury's assessment of the mitigating and aggravating evidence and unduly focused attention on the circumstances of the crime rather than on defendant's character. (See generally *Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954].)

In *People* v. *Easley, supra,* one of the penalty phase instructions provided for consideration of, among other factors, " 'any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime.' " (34 Cal.3d at p. 877.) We did not reach the question of whether under the Eighth Amendment this language was misleading or confusing in omitting specific reference to circumstances relating to the offender as well as the offense. We concluded more fundamentally that "the trial court not only failed affirmatively to advise the jury that it *could* consider as a mitigating factor any aspect of the defendant's character or background, but it expressly—and inaccurately—informed the jury that it *must not* be influenced by sympathy or pity for the defendant." (*Id.,* at p. 878; see also *People* v. *Brown* (1985) 40 Cal.3d 512, 536-537 [220 Cal.Rptr. 637, 709 P.2d 440], revd. *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].)

As a point of future reference, we noted that "trial courts—in instructing on the factor embodied in section 190.3, [factor] (k)—should inform the jury that it may consider as a mitigating factor 'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime' and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' [Citation.]" (*People* v. *Easley, supra,* 34 Cal.3d at p. 878, fn. 10.)

■ Based on statutory construction (*People* v. *Boyd, supra,* 38 Cal.3d at p. 774), we have also concluded that "[e]vidence of a defendant's character and background is admissible under factor (k) only to *extenuate* the gravity of the crime; it cannot be used as a factor in aggravation. [Citation.] The prosecutor may rebut evidence of good character or childhood deprivation or hardship with evidence relating directly to the particular incidents or character traits on which the defendant seeks to rely [citation], and may argue that this mitigating factor is inapplicable, but factor (k) evidence may not be used affirmatively as a circumstance in aggravation." (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1033 [254 Cal.Rptr. 586, 766 P.2d 1].)

■ Addressing the merits of defendant's claim, we find the court avoided *Easley* error by specifically instructing the jury to take into consideration both "defendant's character and background" and any "evidence which arouses in you sympathy or compassion for the defendant." While the enumeration of relevant factors listed "character and background" at the beginning and "sympathy or compassion" at the end, nothing in the instruction taken as a whole implied the jury should consider them mutually exclusive or otherwise unconnected. In addition, the court later instructed, "You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." Also, the prosecutor did not present evidence upon which he impermissibly predicated some theory defendant's "bad" character was relevant to the weighing process. (See *People* v. *Edelbacher, supra,* 47 Cal.3d at p. 1033.)

Moreover, in reading the record as a whole, we do not find a reasonable likelihood the jurors were misled or confused by the failure to juxtapose these two factors. (See *People* v. *Ghent, supra,* 43 Cal.3d at p. 777; see also *Boyde* v. *California* (1990) 494 U.S. 370, __ [108 L.Ed.2d 316, 329-330, 110 S.Ct. 1190, 1198].) In his argument, the prosecutor delineated this issue in consonance with our direction in *Easley* (34 Cal.3d at p. 878, fn. 10; see also CALJIC No. 8.85 (1986 rev.)): "[Factor] k, any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any other aspect of the defendant's character or record that the defendant offers for the basis of a sentence less than death, including sympathy." (See *Hitchcock* v. *Dugger* (1987) 481 U.S. 393, 398 [95 L.Ed.2d 347, 352-353, 107 S.Ct. 1821].) Both sides argued the relative merits of defendant's childhood and other particulars of his background and character in fixing his sentence. (See *People* v. *Caro* (1988) 46 Cal.3d 1035, 1062-1063 [251 Cal.Rptr. 757, 761 P.2d 680]; see also *People* v. *Murtishaw* (1989) 48 Cal.3d 1001, 1032 [258 Cal.Rptr. 821, 773 P.2d 172].)

Nor does the rejection of proffered defense instructions assist defendant's argument. While some may have clarified the matter, others were

redundant or argumentative. More importantly, as we have explained, the court did not misdirect the jury; the argument of counsel as well dispelled any potential for ambiguity. A defendant is not entitled to have the jury instructed in any particular terms if the instruction given adequately conveys the correct rule of law. (See *People* v. *Bowman* (1966) 240 Cal.App.2d 358, 387 [49 Cal.Rptr. 772]; see also *People* v. *Horowitz* (1945) 70 Cal.App.2d 675, 701-702 [161 P.2d 833].) Since we find no reasonable likelihood the jury failed to comprehend the relevant legal principles under the instructions given, the court's rejection of defendant's proffered instructions does not enhance his position on appeal. (See *People* v. *Brigham* (1945) 72 Cal.App.2d 1, 7 [163 P.2d 891].)

### 2. *Refusal to Delete Inapplicable Aggravating and Mitigating Circumstances*

■ Defendant also contends the trial court erroneously refused to delete "inapplicable" aggravating and mitigating circumstances, thus allowing the prosecutor to argue that the absence of mitigation established aggravation. (*Post,* pt. IV.B.2.) The court directed the jury to "consider, take into account and be guided by the following factors, *if applicable . . . .*" (See CALJIC No. 8.84.1 (1984 rev.), italics added.) The court further advised that "[t]he absence of evidence concerning a particular mitigating circumstance does not constitute an aggravating circumstance." In addition, the jury received the standard direction to disregard any instruction not sustained by the facts and not to infer any opinion of the court from the giving of any particular instruction. (See CALJIC No. 17.31.)

We adhere to our determination that the court had no further obligation: "[T]he jury's knowledge of the full range of factors provides a framework for the exercise of its discretion and can assist the jury in placing the particular defendant's conduct in perspective. [Citation.]" (*People* v. *Miranda, supra,* 44 Cal.3d at pp. 104-105; see also *People* v. *Marshall* (1990) 50 Cal.3d 907, 932 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Ghent, supra,* 43 Cal.3d at pp. 776-777.) The statutory language itself contemplates the trier of fact will determine the relevancy of the listed factors; to permit otherwise would invite endless, often irresolvable, controversy at trial and on appeal as to which were "applicable" and which "inapplicable" under the facts. Defendant offers no persuasive argument for reconsidering the soundness of our conclusions.

For similar reasons, the court did not err in failing to identify each factor as either "aggravating" or "mitigating." As a matter of law, some factors can only be considered in mitigation, e.g., moral justification. (See *People* v. *Edelbacher, supra,* 47 Cal.3d at p. 1034.) Others depend upon the

circumstances of the crime, e.g., the defendant's age. (See *People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052] ["the word 'age' in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty"]; see also *People* v. *Haskett* (1990) 52 Cal.3d 210, 229, fn. 5 [276 Cal.Rptr. 80, 801 P.2d 323]; cf. *People* v. *Davenport* (1985) 41 Cal.3d 247, 289 [221 Cal.Rptr. 794, 710 P.2d 861] [" 'whether-or-not' and 'presence-or-absence' phrase used in eight of the [factors] suggests there might be either a presence or an absence of the factors"].) In the latter situation, each side may have its own theory for assessing the same factor in its favor. For example, although the prosecution may argue the defendant was not a callow youth and thus was fully responsible for the consequences of his reprehensible conduct, the defense might point to evidence of his "psychological" immaturity. (See, e.g., *People* v. *Coleman* (1989) 48 Cal.3d 112, 153 [255 Cal.Rptr. 813, 768 P.2d 32]; see also *People* v. *Burton* (1989) 48 Cal.3d 843, 865-866 [258 Cal.Rptr. 184, 771 P.2d 1270]; cf. *People* v. *Dillon* (1983) 34 Cal.3d 441, 488 [194 Cal.Rptr. 390, 668 P.2d 697] [felony-murder conviction disproportionate for 17-year-old youth in light of "ample evidence that because of his immaturity he neither foresaw the risk he was creating nor was able to extricate himself without panicking"].)

Given the nature of the jury's normative function, neither the prosecution nor the defense should be arbitrarily constrained from urging the jury to find life or death more appropriate according to its respective interpretation of the facts. To require the trial court to attach one label or the other would lead to unproductive, insoluble debates and would unduly hamper a meaningful examination of the full range of relevant considerations. As we explained in *People* v. *Jackson, supra,* 28 Cal.3d at page 316, with respect to the 1977 death penalty law, "the aggravating or mitigating nature of these various factors should be self-evident to any reasonable person within the context of each particular case."

### 3. *Residual Doubt*

The defense proffered the following "residual doubt" instruction: "Each individual juror may consider as mitigating factor residual or lingering doubt as to whether the defendant was the actual shooter . . . . [¶] Lingering or residual doubt is defined as the state of mind between beyond a reasonable doubt and beyond all possible doubt. [¶] Thus, if any individual juror has a lingering or residual doubt about whether the defendant was the actual shooter . . . , you must consider this as a mitigating factor and assign it the weight you feel is appropriate."

The trial court refused this formulation because it focused on lingering doubt as to the nature of defendant's participation rather than his guilt. (See *People* v. *Terry* (1964) 61 Cal.2d 137, 145-147, 153 [37 Cal.Rptr. 605, 390 P.2d 381].) The court suggested a modification consistent with *People* v. *Terry, supra*; but, counsel rejected the offer. The defense strenuously argued the substance of the rejected instruction; the prosecutor never suggested it was not a relevant consideration if the jury found it supported by the evidence. ■ Defendant now contends he was constitutionally entitled to an instruction tailored to this specific mitigating circumstance.

Without question, "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any circumstance of the offense that the defendant proffers as a basis for a sentence less than death." (*Lockett* v. *Ohio, supra*, 438 U.S. at p. 604 [57 L.Ed.2d at p. 990], fns. omitted.) The Supreme Court has nonetheless explained that this principle "in no way mandates reconsideration by capital juries, in the sentencing phase, of their 'residual doubts' over a defendant's guilt. Such lingering doubts are not over any aspect of [a defendant's] 'character,' 'record,' or a 'circumstance of the offense.'" (*Franklin* v. *Lynaugh* (1988) 487 U.S. 164, 174 [101 L.Ed.2d 155, 166, 108 S.Ct. 2320].) Accordingly, a trial court has no duty to instruct on this point or to require a higher standard of proof of guilt at the penalty phase. (See *id.*, at pp. 173-174 [101 L.Ed.2d at pp. 165-168].)

In this case, the issue of residual doubt arises in slightly different context, i.e., the jury could reconsider defendant's actual rôle in the killings as a potentially mitigating "circumstance of the offense." This difference, however, is without constitutional distinction. The Supreme Court has never held that the right to present evidence and argue extenuation encompasses a concomitant right to instruction on particularized mitigation. Moreover, in *Franklin* the court expressly declined to find *any* basis for imposing an instructional obligation as to residual doubt, concluding instead that Eighth Amendment concerns are adequately met as long as the defendant is "not deprived of any chance to have his sentencing jury weigh this element of his culpability." (*Franklin* v. *Lynaugh, supra*, 487 U.S. at p. 176 [101 L.Ed.2d at p. 167].)

"*Lockett* does not hold that the State has no role in structuring or giving shape to the jury's consideration of these mitigating factors. [Citation.] Given the awesome power that a sentencing jury must exercise in a capital case, it may be advisable for a State to provide the jury with some framework for discharging these responsibilities. And we have never held that a specific method for balancing mitigating and aggravating factors in a capital

sentencing proceeding is constitutionally required. [Citation.]" (*Franklin* v. *Lynaugh, supra,* 487 U.S. at p. 179 [101 L.Ed.2d at p. 169].) The fair opportunity to present relevant evidence and to argue forbearance thereon sufficiently preserves the defendant's interest in having the jury consider fully all germane aspects of the offense and the offender without requiring additional instructional guidance as to certain extenuating circumstance. (*Id.,* at pp. 177-180 [101 L.Ed.2d at pp. 167-169].)

We therefore conclude that, while a defendant may not be precluded from offering such evidence or arguing its relevance in mitigation, the Eighth and Fourteenth Amendments do not require the jury be instructed to consider residual doubt as to the extent of his participation in the offense, except as statutorily provided.[19] The trial court did not transgress any federal constitutional guaranty in rejecting the proffered instruction.

■ Nor do we find error under the state Constitution. As a general interpretive principle, imposition of the death penalty under California law does not violate the state proscription against cruel or unusual punishment (Cal. Const., art. I, § 17) to the extent it comports with the federal Constitution. (Cal. Const., art. I, § 27; see generally *People* v. *Frierson* (1979) 25 Cal.3d 142, 184-188 [158 Cal.Rptr. 281, 599 P.2d 587].)

Defendant's considerable reliance on *People* v. *Terry, supra,* 61 Cal.2d 137, is likewise misplaced: its holding was not constitutionally based nor did it encompass an instructional mandate. In *Terry,* the defendant was prevented from submitting any evidence or arguing that the jury spare his life based on lingering doubt as to his guilt. We reversed the death penalty on statutory grounds since the sentencing procedure at the time "specifically sanction[ed] the presentation of evidence as to 'the circumstances surrounding the crime . . . and of any facts in . . . mitigation of the penalty.' " (*Id.,* at p. 146; see former § 190.1, added by Stats. 1957, ch. 1968, § 2, p. 3509.)

In explicating our analysis, Justice Tobriner eloquently expressed the rationale that obtains to this day: "Indeed, the nature of the jury's function in fixing punishment underscores the importance of permitting to the defendant the opportunity of presenting his claim of innocence. The jury's task, like the historian's, must be to discover and evaluate events that have faded into the past, and no human mind can perform that function with certainty. Judges and juries must time and again reach decisions that are not free from doubt; only the most fatuous would claim the adjudication of guilt to be infallible. The lingering doubts of jurors in the guilt phase may

---

[19] In addition to the factor (k) instruction, the trial court directed the jury to consider, "if applicable," "[w]hether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor." (§ 190.3, factor (j).)

well cast their shadows into the penalty phase and in some measure affect the nature of the punishment. Even were it desirable to insulate the psychological reactions of the jurors as to each trial, no legal dictum could compel such division, and, in any event, no statute designs it." (*People* v. *Terry, supra,* 61 Cal.2d at p. 146.)

Nevertheless, our holding neither imposed nor contemplated an obligation to instruct on lingering doubt. Nor could it have: Under the law at the time, the jury received virtually no instruction at the penalty phase, its task being to "decide the question without benefit of guideposts, standards or applicable criteria . . . ." (*People* v. *Terry, supra,* 61 Cal.2d at p. 154.) The sentencer's discretion has since become considerably guided and standardized by statute and constitutional imperative. While the defendant retains a necessary degree of evidentiary latitude in appealing for leniency, we discern no basis for extrapolating a concomitant duty to instruct on any specific nonstatutory extenuating factor. *Terry* established no constitutional mandate to do so; and defendant offers no rationale for interpreting our state guaranties any more stringently than comparable federal provisions.[20] Accordingly, we also decline to find instructional error under the California Constitution.[21]

---

[20] *People* v. *Thompson, supra,* 45 Cal.3d 86, does not assist defendant's argument. In that case, we indicated in dictum, "Had the requested instructions actually asked the jury to consider any lingering doubts about defendant's intent to kill, despite the sufficiency of evidence to support [the jury's] special finding, we might seriously consider whether refusal to give such instruction was error. In *People* v. *Terry* [, *supra,* 61 Cal.2d 137], we noted a defendant may call upon such doubts in the penalty phase. [Citations.]" (*Id.,* at pp. 134-135.)

However, as in *Thompson,* defendant failed to frame his instruction in a manner that directed the jury to a proper consideration of the lingering doubt question. As a matter of statutory mandate, the court must charge the jury "on any points of law pertinent to the issue, if requested" (§ 1093, subd. (f); see § 1127; *People* v. *Thompkins* (1987) 195 Cal.App.3d 244, 256-257 [240 Cal.Rptr. 516]); thus, it may be required to give a properly formulated lingering doubt instruction when warranted by the evidence. (See *People* v. *Thompson, supra,* 45 Cal.3d at pp. 134-135; *People* v. *Terry, supra,* 61 Cal.2d at pp. 145-147.) Nevertheless, this obligation obtains only insofar as the request accurately reflects its supporting authority. While, by logical extrapolation, *People* v. *Terry, supra,* 61 Cal.2d 137, may sustain an instruction on lingering doubt as to the nature of the accused's participation, defendant's proffered language erroneously prescribed that the jury evaluate this factor in a particular manner. (See, *post,* fn. 21.) Hence, the trial court did not err in rejecting it.

[21] We also reject defendant's argument that the court erred under the holding of *People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847], in which we stated, "A defendant is entitled to an instruction relating particular facts to any legal issue. [Citations.]" (See also *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 885 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845].) "[A] court may properly refuse an instruction that is argumentative" (*People* v. *Williams, supra,* 45 Cal.3d at p. 1324) or that "single[s] out only a partial list of potential mitigating factors for the jury's consideration." (*People* v. *Howard, supra,* 44 Cal.3d

Equally without merit is defendant's contention that counsel rendered ineffective assistance in declining the court's offer to give a modified version of the proffered residual doubt instruction. The penalty phase strategy was implicitly to concede defendant's participation but argue possible lingering doubts as to whether he fired the fatal shots. The modification did not assist this theory and, counsel may have reasoned, could have distracted the jury from giving full consideration to the thrust of the defense argument. The record thus implies a rational tactical purpose for the refusal consistent with an overall strategy, which we do not find ill-advised under the circumstances.

### 4. *Trivialization of the Jury's Task*

Defendant asserts the trial court impermissibly trivialized the jury's sentencing function by instructing that "[i]n weighing the various circumstances you *simply* determine under the relevant evidence which penalty is justifiable and appropriate by comparing the aggravating circumstances with the mitigating circumstances. [Italics added.]" (See CALJIC No. 8.84.2.) According to defendant, the implication that the penalty determination was a "simple" task violated his Eighth Amendment rights as construed in *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], and in some manner created a mandatory sentencing formula.[22]

In *Caldwell,* the prosecutor told the jury during closing argument, " '[Y]our decision is not the final decision. . . . Your job is reviewable.' " (*Caldwell* v. *Mississippi, supra,* 472 U.S. at p. 325 [86 L.Ed.2d at p. 237].) The trial court also informed the jury that all that death penalty verdicts were automatically reviewed by the state supreme court. (*Id.,* at pp. 325-326 [98 L.Ed.2d at p. 237].) The Supreme Court reversed the sentence: "Given such a situation, the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." (*Id.,* at p. 333 [98 L.Ed.2d at p. 242].) "[I]t is constitutionally imper-

---

375, 442; see also *People* v. *Thompson, supra,* 45 Cal.3d at pp. 132-134 [court did not err in refusing "as framed" requested instruction on defendant's potential for rehabilitation].)

As worded, the instruction invaded the jury's responsibility to determine whether a particular "circumstance of the crime" was aggravating, mitigating, or irrelevant and "arbitrarily stressed certain items of evidence." (*People* v. *Howard, supra,* 44 Cal.3d at p. 442.) The instruction setting forth the list of factors in section 190.3, including factor (k), adequately apprised the jury of the relevant considerations when evaluated in light of the evidence and argument by counsel without disturbing the balance of the weighing process. (See *People* v. *Gordon, supra,* 50 Cal.3d at p. 1277.)

[22] Parenthetically, we note defendant failed to object to any portion of the instruction at trial, suggesting "the potential for [trivialization] argued now was not apparent to one on the spot. [Citation; footnote omitted.]" (See *Lowenfield* v. *Phelps* (1988) 484 U.S. 231, 240 [98 L.Ed.2d 568, 579, 108 S.Ct. 546].)

missible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Id.*, at pp. 328-329 [98 L.Ed.2d at p. 239].)

No such danger or impairment arose under the facts of this case. Defendant has isolated a single word, which he argues compromised the reliability of the penalty verdict. The instructions as a whole contained no suggestion the jury would be absolved of the ultimate consequences of its sentencing decision. Rather, it described the mechanics of the jury's normative process. In this context, "simply" most reasonably referred to the nature of the procedure, i.e., a step-by-step analysis of the law to be applied to the facts, not the nature of the decision itself. At no time did the court indicate the responsibility for that decision would shift or that the verdict was other than final. Nor did the arguments of counsel imply otherwise. (See, e.g., *People* v. *Edelbacher, supra,* 47 Cal.3d at pp. 1039-1040; *People* v. *Milner, supra,* 45 Cal.3d at pp. 254-255.)

On the record, we may justifiably "assume that 'jurors confronted with the truly awesome responsibility of decreeing death for a fellow human [acted] with due regard for the consequences of their decision.' [Citation.]" (*Lockett* v. *Ohio, supra,* 438 U.S. at p. 598 [57 L.Ed.2d at p. 986].) Defendant has not demonstrated any reasonable likelihood the jurors failed to appreciate the significance of their responsibility or to individualize their assessment of his moral culpability. (See also *People* v. *Clark* (1990) 50 Cal.3d 583, 634 [268 Cal.Rptr. 399, 789 P.2d 127].)

We also remain convinced of our well settled determination that the 1978 death penalty law does not create a mandatory sentencing formula. (See *People* v. *Brown, supra,* 40 Cal.3d at p. 540.) In fact, any "mandatory" implication clearly favored defendant: The court instructed the jury it had discretion ("may") to impose death if aggravation outweighed mitigation but was obligated ("shall") to impose life without parole if it concluded to the contrary.

## 5. *Miscellaneous Claims of Instructional Error*

In summary fashion, defendant makes several other allegations of instructional error. He acknowledges we have previously found them all without merit. As he offers no authority or rationale compelling reexamination, we perforce decline to engage in extended analysis in rejecting them.

■ The trial court refused to instruct that "life without possibility of parole" "means that the defendant will remain in state prison for the rest of

his life and will not be paroled at any time." We have recently reaffirmed "that the instruction requested was incorrect. Hence, it was properly refused. [Citation.]" (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1277.) "It is as incorrect to tell the jury the penalty of . . . life without possibility of parole will inexorably be carried out as it is to suggest they need not take their responsibility as seriously because the ultimate determination of penalty rests elsewhere." (*People* v. *Thompson, supra,* 45 Cal.3d at p. 130.) Moreover, nothing in the record supports the claim of a "commonplace misunderstanding" that life prisoners are arbitrarily or capriciously released from confinement. (See *People* v. *Bonin* (1988) 46 Cal.3d 659, 698 [250 Cal.Rptr. 687, 758 P.2d 1217]; see also *People* v. *Gordon, supra,* 50 Cal.3d at pp. 1277-1278.) The thrust of the defense argument urged the jury to assume "without possibility of parole" meant just that; neither the court nor the prosecutor contradicted the reasonableness of that assumption.

██ Defendant also contends ambiguity regarding "criminal activity" (§ 190.3, factor (b)) permitted the jury to double count the circumstances of the underlying crimes. However, by its terms, this factor applies to "other" criminal activity; the trial court specifically instructed which "other" criminal acts it encompasses, i.e., the prior robberies and assaults. The court also cautioned, "You may not consider any evidence of any other criminal acts as an aggravating circumstance." Hence, neither by its express terms nor when viewed in context would the instruction have caused a reasonable juror to misunderstand its import. (*People* v. *Bonin, supra,* 46 Cal.3d at pp. 703-704.)

██ Defendant asserts that in addition to "sympathy or compassion" the court should have specifically instructed the jury to consider "all sympathetic mitigating factors, mercy and non-statutory mitigation" as well. We have held the standard "factor (k)" instruction sufficient to delineate the scope of relevant sentencing considerations (see *People* v. *Caro, supra,* 46 Cal.3d at p. 1067); nothing in the record warrants reexamination of that determination.

██ Defendant also contends the use of "substantial" to modify section 190.3, factor (g)—"domination of another person"—unconstitutionally circumscribed the jury's evaluation of this mitigating circumstance. We have rejected a similar contention with respect to the use of "extreme" to qualify former section 190.3, factor (c) (now factor (d))—"mental or emotional disturbance." "As we explained in [*People* v. *Ghent, supra,* 43 Cal.3d at page 776,] the jury was adequately informed it could consider such evidence since it was instructed it could consider '[a]ny other circumstance which extenuates the gravity of the crime . . . .' [Citations.] This ' "catchall" provision is sufficient to permit the penalty jury to take into account a

mental condition of the defendant which, though perhaps not deemed "extreme," nonetheless mitigates the seriousness of the offense.' [Citation.]" (*People* v. *Murtishaw, supra*, 48 Cal.3d at p. 1033.) By a parity of reasoning, we reach the same conclusion as to "substantial." (*People* v. *Adcox* (1988) 47 Cal.3d 207, 270 [253 Cal.Rptr. 55, 763 P.2d 906].)

B. *Prosecutor's Argument*

■ Defendant raises several claims of prejudicial misconduct committed by the prosecutor during his penalty phase argument. As to each, he did not make a contemporaneous objection at trial and, therefore, has failed to preserve the issue on appeal. (*People* v. *Green, supra*, 27 Cal.3d at p. 27; see *People* v. *Bittaker, supra*, 48 Cal.3d at p. 1104.) "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instruction the harmful effect upon the minds of the jury.' [Citation.]" (*People* v. *Green, supra*, 27 Cal.3d at p. 27.) Our review of the record reflects no exception to this general principle, i.e., in each instance of possible error, a timely admonition would have obviated any misleading impression created by the prosecutor's argument. Accordingly, "defendant is deemed to have waived the objection . . . ." (*Ibid.*)

To forestall any later charge of ineffective assistance of counsel, we will nevertheless address the substance of defendant's contentions. In each instance, we find either that the prosecutor's argument was not improper or that any misstatement was not prejudicial when viewed in context.

1. *Factor (k)—Defendant's Character as Aggravating Circumstance; Mitigation Must Relate to Circumstances of Crime*

■ In conjunction with his claim of misinstruction under *People* v. *Easley, supra*, 34 Cal.3d 858, defendant alleges the prosecutor compounded the problem by arguing that defendant's character could be considered a circumstance in aggravation and that circumstances in mitigation must relate only to the offense and not to the offender. (See *People* v. *Boyd, supra*, 38 Cal.3d at pp. 775-776.) This contention is not sustained by the record.

First, the prosecutor did not misstate the law in defining a "mitigating circumstance" as "reducing the moral culpability *for that act* in some fashion and in some way." (Italics added.) The very purpose of the penalty phase is to determine the appropriate sentence *for the defendant's crime*, i.e., an individualized assessment of the offender's moral culpability for his particular offense in light of statutorily and constitutionally relevant considerations. (See generally *Woodson* v. *North Carolina* (1976) 428 U.S. 280,

303-305 [49 L.Ed.2d 944, 960-962, 96 S.Ct. 2978].) When read in context, this statement also did not impliedly restrict mitigation to the circumstances of the crime.

Second, at no time did the prosecutor suggest defendant's upbringing or other aspects of his background and character were irrelevant to the jury's assessment of whether he should receive the death penalty. (See also *People v. Ainsworth* (1988) 45 Cal.3d 984, 1033 [248 Cal.Rptr. 568, 755 P.2d 1017].) Rather, he argued that the brutality of the murders and defendant's cold-blooded execution of the victims outweighed any mitigatory significance. The prosecutor also did not erroneously imply that defendant's early home life and the negative influence of peer pressure should somehow be held against him. The thrust of this argument was that defendant had also had the countervailing benefit of a stable, secure environment provided by his great-grandmother as well as the concern of teachers who afforded guidance and sought to act as role models. A prosecutor does not mischaracterize such evidence by arguing it should not carry any extenuating weight when evaluated in a broader factual context. We have consistently declined to criticize advocacy of this nature. (See, e.g., *People v. Hamilton* (1989) 48 Cal.3d 1142, 1183 [259 Cal.Rptr. 701, 774 P.2d 730]; *People v. Caro, supra,* 46 Cal.3d at pp. 1062-1063; *People v. Belmontes, supra,* 45 Cal.3d at p. 807.)

### 2. *Davenport Error*

"In [*People v.*] *Davenport, supra,* 41 Cal.3d 247, 289-290, we held it improper for a prosecutor to argue that the absence of evidence of a statutory factor permitted or required that the factor be considered as one in aggravation. Thus the absence of evidence showing moral justification, extreme duress, extreme emotional disturbance, or childhood deprivation cannot be factors in aggravation. As we noted in *Davenport,* the factors mentioned in section 190.3 are to be considered only if relevant, and a mitigating factor such as duress or moral justification is irrelevant and should be disregarded when there is no evidence of its existence." (*People v. Edelbacher, supra,* 47 Cal.3d at p. 1034.)

Defendant correctly contends the prosecutor failed to adhere to "the spirit, if not the letter," of this directive. (*People v. Ainsworth, supra,* 45 Cal.3d at p. 1034.) "In essence, [he] argued that certain otherwise mitigating factors should, on the facts of this case, be considered as aggravating." (*Id.,* at p. 1034, fn. omitted; see also *People v. Walker, supra,* 47 Cal.3d at pp. 643-644.) Nevertheless, *Davenport* error does not mandate reversal of the penalty: The transgression must be viewed in the context of both the prosecution and defense arguments and the court's instructions to deter-

mine whether we can "be confident that the jury properly understood the nature of the weighing process and its relation to the appropriateness determination . . . ." (*People* v. *Edelbacher*, *supra*, 47 Cal.3d at p. 1035; *People* v. *Hamilton*, *supra*, 48 Cal.3d at pp. 1184-1185.) After careful consideration, we find the record inspires the requisite degree of confidence.

Significantly, although the prosecutor misconstrued the law somewhat during his analysis of specific statutory factors, he prefaced his remarks with a correct statement of the applicable rule: "[T]he court will give you the instruction . . . that the absence of some factor there does not make it an aggravating factor, but neither does it make it a mitigating factor. [¶] So when you look at some of these factors such as this one in D, if there is no evidence of that, of course, it would be neither way." The court instructed as well, "The absence of evidence concerning a particular mitigating circumstances does not constitute an aggravating circumstance."

The prosecutor also did not convey the impression that the absence of any evidence of a specific factor, in and of itself, was a circumstance in aggravation. When reasonably read in context, his argument characterized each factor so as to relate it to the circumstances of the crime, e.g., defendant acted "very coldbloodedly and methodically," negating any mitigation attributable to intoxication. (§ 190.3, factor (h); see *People* v. *Burton*, *supra*, 48 Cal.3d at p. 865.) While confining his analysis to statutorily relevant matters, he fragmented it in a manner that tended to inflate one particular basis, section 190.3, factor (a), for finding aggravation. (See *People* v. *Morris, ante*, 152 at p. 233, fn. 24 [279 Cal.Rptr. 720, 807 P.2d 949].) However, both the prosecution and the defense as well as the court repeatedly described the sentencing determination as a weighing process, "not just a matter of adding up these various categories" or "a mere mechanical weighing of factors on each side of an imaginary scale" or "a matter of counting." (See generally *People* v. *Brown*, *supra*, 40 Cal.3d at pp. 538-544.)

Moreover, although passing allusions were made to defendant's upbringing, the critical focus was the nature of the murders themselves and the degree of defendant's participation. Whether characterizing them as unitary or multifaceted, both sides argued strenuously that the circumstances of the crimes, particularly defendant's responsibility for the actual killings, were ultimately dispositive of the penalty determination. Hence, in context the prosecutor's evaluation amounted to "an exhortation that the evidence supported the conclusion that the aggravating circumstances *overwhelmingly* outweighed the mitigating circumstances in this case."[23] (*People* v. *Walker*,

---

[23] Accordingly, we reject defendant's contention that the prosecutor's failure to adhere to the "spirit" of *People* v. *Davenport*, *supra*, 41 Cal.3d 247, constituted misconduct under the circumstances.

*supra*, 47 Cal.3d at p. 644.) We find no basis for concluding the argument confused or misled the jury as to its responsibility to weigh all the evidence in reaching a verdict appropriate under the facts. (*Ibid.*; see also *People* v. *Hamilton, supra*, 48 Cal.3d at p. 1185.)

### 3. *Lack of Remorse as Aggravating Circumstance*

■ Defendant also complains of the prosecutor's references to his failure to express contrition as a factor in aggravation. "[T]he propriety of commenting on lack of remorse depends to a degree on the inference one is asking the jury to draw from it. [Citation.]" (*People* v. *Thompson, supra*, 45 Cal.3d at p. 124.) "In *People* v. *Ghent, supra*, 43 Cal.3d 739, 771, we observed that '[t]he concept of remorse for past offense as a mitigating factor sometimes warranting less severe punishment or condemnation is universal. The prosecutor's argument here merely demonstrated the absence of that particular mitigating factor. [Citation.]' [¶] Although *Ghent* arose under the 1977 death penalty law, we think its reasoning applies with equal force to the present case, tried under the 1978 law. Both laws require the jury to weigh the aggravating and mitigating factors in deciding the penalty issue. Under both sentencing procedures, the prosecutor should be entitled to observe that a particular mitigating circumstance, such as the defendant's remorse for his victims, is lacking from the case. [Citation.] Of course, the prosecutor is not permitted to argue that the absence of such mitigating factors is itself an *aggravating* factor justifying the death penalty [citation]." (*People* v. *Dyer, supra*, 45 Cal.3d at p. 82.)

After reviewing the record, we find no impropriety. Moore and Brown testified that defendant remarked, "I just blew the bitch's head off," when he reentered the van after the shooting, suggesting a callous indifference to the consequences of his lethal acts. At the penalty phase, the defense essentially conceded defendant's presence during the killings but sought to minimize his actual participation. "Under such circumstances, it is not unfair to expect defendant to show some remorse . . . ." (*People* v. *Miranda, supra*, 44 Cal.3d at p. 112; see *People* v. *Gallego, supra*, 52 Cal.3d at p. 197; *People* v. *Williams, supra*, 44 Cal.3d at pp. 966-967.) However, according to his great-grandmother, he consistently assured her he "had never hurt nobody in [his] life."

Under these circumstances, the prosecutor's two passing comments were not untoward. In one, he suggested defendant's lack of remorse undermined any sympathy that might have been engendered by his family's pleas to spare his life. Since the import of this argument challenged defendant's offer

of mitigation, it was acceptable.[24] (See *People* v. *Walker, supra,* 47 Cal.3d at p. 650; *People* v. *Thompson, supra,* 45 Cal.3d at p. 124.)

While the other reference tended to cast lack of remorse as an aggravating factor, the prosecutor was simply emphasizing the "callous execution style" nature of the killings, i.e., a relevant circumstance of the offense. The context of the argument thus negated the possibility of an impermissible inference that lack of remorse, in and of itself, made defendant's crimes more reprehensible. Accordingly, we find "that such remarks could not have affected the penalty verdict. [Citation.]" (*People* v. *Walker, supra,* 47 Cal.3d at p. 650; see also *People* v. *Carrera, supra,* 49 Cal.3d at p. 339.)

 4. *Sympathy for Victims and Their Families; Use of Victims' Pictures in Life*

■ Defendant also alleges the prosecutor's argument regarding jury sympathy for the victims and their families and his reference to pictures of the victims in life contravened the restrictions imposed by *Booth* v. *Maryland, supra,* 482 U.S. 496, and *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207]. In *Booth,* the Supreme Court condemned the use of a victim impact statement, describing the effect of the murders on family members, in light of the potential for improperly diverting the jury's attention from the circumstances of the crime itself and the character and background of the defendant. (*Booth* v. *Maryland, supra,* 482 U.S. at pp. 504-505 [96 L.Ed.2d at pp. 449-450].) In *Gathers,* the court relied on *Booth* in finding fault with the prosecutor's references in argument to personal qualities of the victim that did not relate to the circumstances of the crime and of which the defendant could not have been aware at the time. (*South Carolina* v. *Gathers, supra,* 490 U.S. at pp. 810-812 [104 L.Ed.2d at pp. 882-883].)

The principle underlying *Booth* and *Gathers* appertains to the danger of interjecting into the sentencing determination consideration of "the character and reputation of the victim and the effect [of the crime] on his family," matters "wholly unrelated to the blameworthiness of a particular defendant." (*Booth* v. *Maryland, supra,* 482 U.S. at p. 504 [96 L.Ed.2d at p. 449].) In this regard, the Supreme Court noted with approval the following observation of our own Court of Appeal: " 'We think it obvious that a defendant's level of culpability depends not on fortuitous circumstances such as

---

[24] Moreover, the tenor of the argument did not implicate defendant's failure to testify (see *People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168 [80 Cal.Rptr. 920, 459 P.2d 248]) or draw speculative inferences from a total absence of evidence. The prosecutor's comments referred to testimony by family members relating defendant's statements about the crimes, and by percipient witnesses describing the circumstances of the killings.

the composition of his victim's family, but on circumstances over which he has control. A defendant may choose, or decline, to premeditate, to act callously, to attack a vulnerable victim, to commit a crime while on probation, or to amass a record of offenses. . . . In contrast, the fact that a victim's family is irredeemably bereaved can be attributable to no act of will of the defendant other than his commission of the homicide in the first place . . . .' [Citation.]" (*Id.*, at p. 504, fn. 7 [96 L.Ed.2d at pp. 449-450], quoting *People* v. *Levitt* (1984) 156 Cal.App.3d 500, 516-517.)

The remarks cited by defendant do not raise any of the foregoing concerns. Most importantly, the jury heard neither evidence nor argument describing the personal qualities of the victims or the impact on their families. Rather, the prosecutor's comments focused on specific aggravating or mitigating factors, offering the jury his estimation of their relative significance. For example, the record does not reflect an appeal to "sympathy" for "the victims from the Alexander family." These references arose in the broader context of whether the pleas of *defendant's* family should evoke sufficient overriding sympathy to warrant sparing his life. The prosecutor essentially sought to balance the jury's perspective, which does not generally constitute *Booth* error. (See *People* v. *Burton, supra*, 48 Cal.3d at p. 869; see also *Booth* v. *Maryland, supra*, 482 U.S. at p. 507, fn. 10 [96 L.Ed.2d at p. 451].)

Most of the other remarks related in some manner to the circumstances of the crime, referring broadly to the vulnerability of the victims and the brutality of their deaths. To that extent they were not inappropriate (see *Booth* v. *Maryland, supra*, 482 U.S. at p. 507, fn. 10 [96 L.Ed.2d at p. 451]); nor could they have impaired the jury's objectivity or impermissibly diverted its attention from weighing the statutory factors as instructed. (See *People* v. *Morales* (1989) 48 Cal.3d 527, 571-572 [257 Cal.Rptr. 64, 770 P.2d 244].)

The prosecutor also argued that the victims would have wanted another month or day to live and that Ebora Alexander's murder was her reward for a long life of "tribulation" and "good work." These observations were in response to the defense argument that an estimated 55 years in prison without possibility of parole was sufficient punishment: The prosecutor "simply asked that the jury not forget the victims and that the jurors consider the lives they might have had. This argument is permissible at the penalty phase. [Citation.]" (*People* v. *Williams, supra*, 44 Cal.3d at p. 967.)

In his closing remarks, the prosecutor briefly directed the jury's attention to the photographs of the victims in life. Although the use of these pictures at the guilt phase was unnecessary and therefore improper (*ante*, III.C.), at

the penalty phase different considerations obtain. (See *People* v. *Hovey*, *supra*, 44 Cal.3d at p. 576.) This evidence visually depicted a "circumstance of the crimes," portraying the victims as defendant saw them seconds before he killed them. (See also *People* v. *Carrera*, *supra*, 49 Cal.3d at pp. 336-337.) The photographs graphically illustrated that, irrespective of any personal qualities unknowable to him, defendant must have been well aware he chose to murder an elderly woman and two young boys as well as a defenseless younger woman. (*People* v. *Frank* (1990) 51 Cal.3d 718, 734 [274 Cal.Rptr. 372, 798 P.2d 1215]; see *Booth* v. *Maryland*, *supra*, 482 U.S. at p. 507, fn. 10 [96 L.Ed.2d at p. 451]; see also *People* v. *Lewis*, *supra*, 50 Cal.3d at pp. 283-284 [appropriate to invite jurors "to put themselves in the shoes of the victim"].) The prosecutor did not utilize the photographs to support some abstract emotional appeal but to illustrate the victims' vulnerability as a relevant consideration in evaluating the egregiousness of the offenses. Accordingly, we reject defendant's claim of impropriety.

## C. *Evidence of Defendant's Violent Criminal Conduct as Juvenile*

■ Pursuant to section 190.3, factor (b),[25] the prosecution presented evidence of two robbery incidents involving defendant when he was fifteen years old, including one in which he stole an automobile and engaged in a high-speed chase with police officers, which defendant contends was inadmissible because it did not relate to a statutory factor in aggravation.[26]

Although perhaps not clear at the time of defendant's trial (but see *People* v. *Boyd*, *supra*, 38 Cal.3d at p. 767), the law has since been settled that any criminal activity involving force or violence comes within the purview of section 190.3, factor (b), irrespective of the offender's age: "[N]othing in the 1977 or 1978 laws indicates an intent to exclude violent criminal misconduct while a juvenile as an aggravating factor, simply on grounds the misconduct resulted in a juvenile wardship adjudication." (*People* v. *Lucky*, *supra*, 45 Cal.3d at p. 295, fn. omitted.)

This determination raises no inconsistency with the language or intent of the Juvenile Court Law. "The statutes provide, of course, that a juvenile adjudication 'shall not be deemed *conviction* of a crime for any purpose. . . .' (Welf. & Inst. Code, § 203, italics added.) However, introduc-

---

[25] Section 190.3, factor (b), provides that in determining the penalty, the trier of fact shall take into account "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

[26] Since the court *did not* admit any evidence of defendant's subsequent wardship adjudications or commitments to the California Youth Authority, we reject out of hand his contention the jury impermissibly considered such matters. (See also *People* v. *Gallego*, *supra*, 52 Cal.3d at p. 195.)

tion of the *underlying violent juvenile misconduct* as 'violent' criminal activity under section 190.3, factor (b), does not violate that proscription. It is not the adjudication, but the conduct itself, which is relevant." (*People* v. *Lucky, supra,* 45 Cal.3d at p. 295, fn. 24; *People* v. *Burton, supra,* 48 Cal.3d at p. 862.) Accordingly, while evidence of a wardship adjudication is inadmissible under section 190.3, factor (c), as a prior felony conviction, that bar does not preclude evidence of the underlying violent conduct under factor (b).[27] (See *People* v. *Lucky, supra,* 45 Cal.3d at p. 295.)

Defendant's reliance on section 15 is misplaced. That statute defines a "crime or public offense" by reference to the imposition of various forms of punishment; it does not purport to delineate "criminal activity" for purposes of section 190.3, factor (b). Nor does the recent United States Supreme Court decision in *Thompson* v. *Oklahoma* (1988) 487 U.S. 815 [101 L.Ed.2d 702, 108 S.Ct. 2687], prohibiting the execution of any person who was a minor at the time of the offense, alter our analysis. Defendant was sentenced to death for crimes committed as an adult. The fact that the jury may have considered criminal activity he engaged in as a juvenile in determining the appropriate penalty does not implicate the Eighth Amendment as applied in *Thompson*.

We also discern no other basis for finding constitutional error. Pursuant to statutory mandate (§ 190.3), the prosecution apprised the defense of its intent to submit these matters at the penalty phase. The court imposed no limitations on cross-examination of the victims and other percipient witnesses.[28] The jury was fully instructed on the requisite elements of the crimes involved (see *People* v. *Phillips* (1985) 41 Cal.3d 29, 72 [222 Cal.Rptr. 127, 711 P.2d 423]) and properly directed not to consider the evidence unless it found beyond a reasonable doubt that defendant committed the acts. (See *People* v. *Caro, supra,* 46 Cal.3d at p. 1057.) ■ The use of such past conduct also does not implicate the proscription against double jeopardy: The critical consideration under factor (b) is the defendant's "use or attempted use of force or violence," not any resultant adjudication. (See *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666,

---

[27] Elsewhere, defendant summarily contends the admission of "unadjudicated, non-violent juvenile activity" violated his constitutional rights. However, he fails to identify the allegedly inadmissible evidence or explain the nature of the court's error. Accordingly, we decline to consider the claim further.

[28] Without explanation or discussion, defendant contends the "introduction of live testimony as the method of proving prior juvenile adjudications" infringed various rights. We perceive no constitutional concerns based solely on the use of in court testimony and find the assertion internally inconsistent with his further claim that this procedure precluded "a reasonable opportunity to rebut such evidence. . . ." Not only could the jury observe the witnesses' demeanor while testifying, the defense was able to test their credibility through cross-examination.

743 P.2d 301].) Furthermore, the penalty verdict is attributable to his current conduct, i.e., murder with a special circumstance finding, not his past criminal activity. (See § 1023; cf. *People* v. *Balderas, supra*, 41 Cal.3d at p. 203, fn. 31 [no violation of section 654 "by use of a prior crime on which defendant has been sentenced as an aggravating factor in a capital penalty trial. Any such rule would invalidate all statutory 'habitual criminal' enhancements."].)

### D. *Proportionality of Defendant's Sentence*

Defendant next contends under the state and federal Constitutions that "the death penalty in this case is disproportionate considering [his] involvement in the offense and his background and character." He also seeks "a review for disparity of sentence" compared to similar offenses. (See § 1170, subd. (f).) Alternatively, he asks that this court exercise its discretion to reduce his sentence pursuant to section 1260. In light of settled authority and the facts of this case, we reject each of these contentions.

■ The law is now well established that the Eighth Amendment does not mandate intercase proportionality review. As the United States Supreme Court definitively explained in *Pulley* v. *Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871], in its prior decisions "[p]roportionality review was considered to be an additional safeguard against arbitrarily imposed death sentences, but we certainly did not hold that comparative review was constitutionally required." (*Id.*, at p. 50 [79 L.Ed.2d at p. 40]; see also *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Frierson, supra*, 25 Cal.3d at pp. 180-182.)

■ Under the state Constitution (art. I, § 17), "we must determine whether the penalty 'is so *disproportionate* to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' [Citations.]" (*People* v. *Frierson, supra*, 25 Cal.3d at p. 183; see *People* v. *Jackson, supra*, 28 Cal.3d at p. 317.) Notwithstanding his youth at the time, the brutal facts of the crimes and the absence of any other substantial mitigation render it "impossible for defendant to show his sentence is disproportionate to his individual culpability." (*People* v. *Brown* (1988) 46 Cal.3d 432, 462 [250 Cal.Rptr. 604, 758 P.2d 1135]; see also *People* v. *Caro, supra*, 46 Cal.3d at p. 1068.) As the trial court summarized, "The defendant deliberately and with premeditation and malice aforethought and in a conspiracy with others murdered the victims in cold blood without any concern, pity, consideration or other compassion for the victims or their families." The record fully substantiates this assessment and justifies the severity of the penalty.

As for defendant's statutory claims, in *People* v. *Allen*, *supra*, 42 Cal.3d 1222, we rejected "the notion that equal protection principles mandate that the 'disparate sentencing' procedure of section 1170, subdivision (f) must be extended to capital cases." (*Id.*, at pp. 1287-1288.) Section 1170, subdivision (f), is intended to promote the uniform-sentence goals of the Determinate Sentencing Act and sets forth a process for implementing that goal by which the Board of Prison Terms reviews comparable cases to determine if different punishments are being imposed for substantially similar criminal conduct. (42 Cal.3d at p. 1286.) "[P]ersons convicted under the death penalty are manifestly not similarly situated to persons convicted under the Determinate Sentencing Act and accordingly cannot assert a meritorious claim to the 'benefits' of the act under the equal protection clause [citations]." (*People* v. *Williams*, *supra*, 45 Cal.3d at p. 1330.) Defendant offers no factual or legal impetus to reconsider these conclusions.

Defendant's argument for reduction of his sentence based on intracase proportionality review under *People* v. *Dillon*, *supra*, 34 Cal.3d at pages 477-482, is equally unavailing. In *Dillon*, an immature 17-year-old, who shot and killed his victim out of fear and panic, received a mandatory life sentence by operation of the felony-murder rule, while his confederates were given "petty chastisements." Both the trial judge and the jury were of the view the sentence was excessive in relation to his true culpability. (*Id.*, at pp. 482-488.)

The facts of this case offer no credible point of comparison. In sustaining the jury's guilt and penalty verdicts, the trial court emphasized that the evidence established "clearly beyond a reasonable doubt" that "defendant himself, without question, was the actual killer," who acted "deliberately and with premeditation" and without moral justification. Codefendant Williams received the death penalty and codefendant Burns was sentenced to life in prison without possibility of parole for their participation. (See *People* v. *Burns* (1987) 196 Cal.App.3d 1440 [242 Cal.Rptr. 573], review den. Mar. 31, 1988.) Thus, defendant's sentence is not disproportionate to either his individual culpability or the punishment of his partners in crime. (See, e.g., *People* v. *Caro*, *supra*, 46 Cal.3d at p. 1068; *People* v. *Miranda*, *supra*, 44 Cal.3d at p. 118.) We likewise find no basis for exercising our discretion to reduce defendant's punishment pursuant to section 1260.

E. *Miscellaneous Constitutional Challenges to 1978 Death Penalty Statute*

In summary fashion and without critical analysis, defendant raises several challenges to the validity of the 1978 death penalty statute under the federal and state Constitutions. We have consistently rejected each of these

arguments and do so again. (See *People* v. *Allison* (1989) 48 Cal.3d 879, 899 [258 Cal.Rptr. 208, 771 P.2d 1294].)

■ No constitutional imperative requires written findings or jury unanimity as to aggravating circumstances, proof beyond a reasonable doubt of aggravating circumstances, or proof beyond a reasonable doubt that aggravating factors outweigh those in mitigation or that death is the appropriate penalty. (*People* v. *Allen, supra,* 42 Cal.3d at p. 1285; *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779; see *People* v. *Robertson, supra,* 48 Cal.3d at p. 58; *People* v. *Bonin, supra,* 47 Cal.3d at p. 857; *People* v. *Belmontes, supra,* 45 Cal.3d at p. 805; *People* v. *Thompson, supra,* 45 Cal.3d at pp. 135-136.) We have also declined to mandate jury unanimity as to prior criminal activity. (*People* v. *Caro, supra,* 46 Cal.3d at p. 1057.) Finally, the United States Supreme Court has found no deficiency in the method or scope of appellate review utilized in California death penalty cases. (See, e.g., *Pulley* v. *Harris, supra,* 465 U.S. at pp. 49, 51-53 [79 L.Ed.2d at pp. 440-442].)

## V. NEW TRIAL MOTION

Defendant challenges the trial court's denial of his motion for a new penalty trial and asserts the prosecutor, aided and abetted by the court, unconstitutionally interfered with his ability to obtain evidence to substantiate juror misconduct. These contentions arise in the following factual context: After the penalty verdicts were read and the jury polled, the court apparently informed the jurors the defense attorneys wished to speak with them and they were free to do so at that time or later if they so desired. The parties were then directed to return March 18, 1986, for sentencing. Subsequently, the court signed an order "allowing defense counsel through their investigators to be able to make contact with the jurors in this case."

On March 5, in response to ex parte[29] representations of the prosecutor, the court issued an interim directive that defense counsel and their investigator "cease contact in any way with members of the jury on this case." At a hearing the following day, the prosecutor explained that a juror had called him expressing some anxiety at having been contacted by a defense investigator, who had her home address. The individual also related similar experiences and reactions of two other jurors. The court ordered that all further communications between the defense and jurors not already expressly agreeable thereto would be through court personnel. The court agreed to provide defense questionnaires and inform the jurors that, while they were

---

[29] Apparently some effort was made to contact defense counsel Cook, but he was unavailable. Since no particular restriction of the defense actually resulted from the March 5 proceedings, we do not find defendant could have been prejudiced by their ex parte nature. The same issues were fully discussed and resolved the following day with his counsel present.

under no obligation to respond in any manner, it did not disapprove the procedure.

On March 18, the court granted a two-week continuance based on a claim that "actions of the district attorney and the court" had prevented the defense from obtaining information about possible jury misconduct. According to counsel, the prosecutor had engaged in "inflammatory" conduct and had "intimidated jurors through the news media so no jurors will talk to us now."

Subsequently, a defense questionnaire was sent to each of the jurors. Some were returned to defense counsel through the court, but neither the questionnaires themselves nor their contents were revealed or offered into the record. On April 30, the court held a hearing on the motion for a new trial. The motion was unaccompanied by any affidavits, but counsel made the following oral representations apparently based on the statement originally obtained by a defense investigator from Juror Whitfield:

"[W]e have evidence that Shirley Crawford was talking about the letter received in the Burns' [sic] trial, the letter that was intercepted by the sheriffs which implicated Mr. Burns and Mr. Cox in the shooting, which was not part of the evidence in this case.

"We also have evidence that jurors were told not to smoke at the table while they were deliberating because the nonsmoking jurors were bothered by it; and that they refused to follow that order and did smoke causing some jurors to be intimidated and change their votes.

"Also, we have evidence that juror Michael Milner was drinking during lunch.

"Also, we have evidence that it was discussed that Burns got a life sentence which was not part of the evidence in this case.

"Also, it was brought out that a juror, Arthur Williams, told the entire panel that the death penalty had not been exercised in California since the 1960s; and with Rose Bird on the court, that Mr. Cox would not die anyway so it didn't matter whether they gave him death or not.

"At one point the jury was hung seven for death and five for life; and one of the jurors for death told the life jurors that if they held out the jury would be locked up for three weeks; and this influenced some of the jurors to change their votes."

Juror Whitfield had been subpoenaed by the defense, and counsel asked that she be called to the stand. Defendant argued such a procedure was necessary under the circumstances because the prosecutor's "inflammatory" statements to the press had denied him access to the jurors after trial. After evaluating various considerations, including lack of notice to the prosecution and juror harassment and intimidation, the court refused to hear any testimony. It also found the defense "in [an especially] poor position to have any good grounds for a motion for new trial" without affidavits substantiating misconduct, given its own efforts to facilitate attempts to garner evidence. On that basis, the court denied the motion and pronounced sentence. Defendant contends the court erred in denying both his request for an in court examination of Juror Whitfield and his motion for a new trial.

### A. *Allegations of Juror Misconduct Insufficient to Warrant New Trial*

■ " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' [Citations.]" (*People* v. *Williams, supra,* 45 Cal.3d at p. 1318.) Of the six proffered allegations of misconduct, four clearly would not be grounds for a new trial. Accordingly, the court properly rejected defendant's motion as to those matters.

Evidence Code section 1150, subdivision (a), provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." ■ The statute thus makes a "distinction between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved . . . ." (*People* v. *Hutchinson* (1969) 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P.2d 132].) "This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent." (*Id.,* at p. 350; *People* v. *Ozene* (1972) 27 Cal.App.3d 905, 914 [104 Cal.Rptr. 170].)

■ Applying these principles, we must reject the allegations of misconduct predicated on the intimidation of nonsmoking jurors and the expressed

desire of some jurors to resolve the penalty and avoid prolonged deliberations, to the extent they clearly implicate "fellow jurors' mental processes or reasons for assent or dissent." (*People* v. *Hutchinson, supra,* 71 Cal.2d at p. 350.)

In *People* v. *Orchard* (1971) 17 Cal.App.3d 568 [95 Cal.Rptr. 66], the defense sought a new trial because the foreman had chastised one of the jurors during deliberations, which " 'so embarrassed and humiliated [her] in front of the other members of the jury that she voted "guilty" on the next ballot rather than be subjected to the domination and coercion of the foreman.' " (*Id.,* at p. 572, fn. 1.) Discounting those portions of the affidavit recounting the effect of the foreman's conduct, the Court of Appeal concluded the remainder "simply describe[d] an account of interchange between jurors . . . . To permit inquiry as to the validity of a verdict based upon the demeanor, eccentricities or personalities of individual jurors would deprive the jury room of its inherent quality of free expression." (*Id.,* at p. 574.)

Under similar circumstances here, we are precluded from considering any matters concerning the jurors' ratiocinations. Thus, while the *conduct* of jurors disregarding an agreement on smoking or complaining about the pace of deliberations may be scrutinized, the *effect* of this conduct on subsequent votes may not be. When we exclude the latter, the former, standing alone, does not implicate juror misconduct; nor does the record otherwise demonstrate that some members of the jury were prevented from freely expressing their views because of these two circumstances. Accordingly, these allegations would not sustain defendant's motion for a new trial. (See also *People* v. *Aeschlimann* (1972) 28 Cal.App.3d 460, 471-472 [104 Cal.Rptr. 689].)

■ As to the assertion one of the jurors imbibed during lunch, "the rule is now fairly well established that a verdict will not be set aside in the absence of some showing or some reasonable ground to suspect that the consumption of alcohol actually affected the jurors' capacity to competently perform their duties. [Citation.]" (*People* v. *Allen, supra,* 42 Cal.3d at p. 1266; *People* v. *Trevino* (1985) 39 Cal.3d 667, 693, fn. 27 [217 Cal.Rptr. 652, 704 P.2d 719], disapproved on other grounds in *People* v. *Johnson, supra,* 47 Cal.3d at p. 1221.) Here, the defense represented "that [a juror] was drinking during lunch" but failed to allege any impairment of his abilities during trial or deliberations. Thus, no misconduct appears.

Nevertheless, given our particular concern to preserve the reliability of death penalty verdicts, we reiterate an earlier admonition on this subject: "The consumption of alcoholic beverages by jurors, whether during the

presentation of evidence or during deliberation, is clearly to be discouraged. The defendant as well as the People have a right to the reasoned, dispassionate and considered judgment of the jury. Because the consumption of alcoholic beverages may impair one's ability to perceive and judge, use of such intoxicants by jurors threatens both the fairness of the trial and the integrity of the entire judicial process." (*People* v. *Allen, supra,* 42 Cal.3d at p. 1265.)

■ We also find no merit to the allegation that one of the jurors referred to former Chief Justice Rose Bird and the fact "that the death penalty had not been exercised in California since the 1960s; . . . so it didn't matter whether they gave him death or not." The latter portion of the statement implicates the jurors' reasoning process and, under Evidence Code section 1150, subdivision (a), may not be considered on motion for a new trial. As to the former portion, these references come within the ambit of "knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience," which jurors necessarily bring to their deliberations because our jury system is "fundamentally human." (*People* v. *Marshall, supra,* 50 Cal.3d at p. 950.)

At the time the jury was considering defendant's penalty, February 1986, Chief Justice Bird and Associate Justices Grodin and Reynoso were the objects of a strenuous and well publicized campaign to unseat them at the impending retention election. It coalesced around the high percentage of death penalty reversals and the claim that, led by the Chief Justice, this court was intentionally evading the law in refusing to affirm more of those decisions and allow executions to recommence. Regardless of their political interest or inclination, few citizens of the state could have been unaware of the situation or the circumstances prompting these efforts. (See, e.g., *People* v. *Morris, supra, ante,* at pp. 180-181.) We find no misconduct in a single reference to factual matters of which the entire jury undoubtedly had some independent knowledge.

### B. *Insufficiency of Evidence as to Remaining Allegations of Misconduct*

The foregoing determinations resolve defendant's contention that the trial court erred in denying his motion for a new trial with respect to these four allegations of juror misconduct without further consideration of the prosecutor's conduct or the procedures utilized by the court. ■ The representations relating to the Burns letter and his sentence of life without possibility of parole do implicate juror impropriety, however; we must examine their factual and legal context more critically. If substantiated, these claims raise a possibility the jury considered evidence not received in the course of defendant's trial. "Evidence obtained by jurors from sources other

than in court is misconduct and constitutes grounds for a new trial if the defendant has been prejudiced thereby. (Pen. Code, § 1181, subd. 2.)" (*People* v. *Williams, supra,* 44 Cal.3d at p. 1156.)

The trial court must nevertheless examine the proffered basis for the new trial motion and determine whether credible and admissible evidence substantiates the underlying allegations. In this case, defendant offered to submit the unsworn statement of Juror Whitfield and the affidavit of a defense investigator recounting her statement to him. Under the circumstances, the court did not abuse its discretion in according little, if any, credence to assertions the declarant was unwilling to verify. (See *People* v. *Scott* (1982) 129 Cal.App.3d 301, 307, 309 [180 Cal.Rptr. 891]; *People* v. *Brown* (1976) 61 Cal.App.3d 476, 479 [132 Cal.Rptr. 217]; see also *People* v. *Pierce* (1979) 24 Cal.3d 199, 206, fn. 3 [155 Cal.Rptr. 657, 595 P.2d 91]; *People* v. *Guthaus* (1962) 208 Cal.App.2d 785, 792 [25 Cal.Rptr. 735].) Furthermore, "[i]t is settled . . . that 'a jury verdict may not be impeached by hearsay affidavits.' [Citations.]" (*People* v. *Williams, supra,* 45 Cal.3d at pp. 1318-1319.) The record thus contains no competent evidence the jury considered matters not introduced at defendant's trial; the court thus properly denied the motion for lack of evidentiary support.

Our recent decision in *People* v. *Hedgecock* (1990) 51 Cal.3d 395 [272 Cal.Rptr. 803, 795 P.2d 1260], does not alter this conclusion. In *Hedgecock,* we held that "it is within the discretion of a trial court to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing. [Footnote omitted.]" (*Id.,* at p. 419.) This holding is, nonetheless, qualified by our discussion of the rationale in its factual context.

Defendant Hedgecock's motion for a new trial was supported by affidavits implicating juror misconduct; the prosecution submitted counter-affidavits denying any impropriety occurred. Believing it lacked authority to do so, the trial court refused to hold an evidentiary hearing to resolve the conflicts. (*People* v. *Hedgecock, supra,* 51 Cal.3d at pp. 411-414.) Since section 1181 does not expressly preclude in court questioning of jurors, we concluded the court improperly failed to exercise its discretion to determine whether this procedure was appropriate under the circumstances.

"We stress[ed], however, that the defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*People* v. *Hedgecock, supra,* 51 Cal.3d at pp. 415-416.) Nor did we mandate examination of jurors in every instance of alleged misfeasance. "The hearing should not be

used as a 'fishing expedition' to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing."[30] (*Id.*, at p. 419.)

 Here, the trial court was confronted not with conflicting evidence but one juror disinclined, for whatever reason, to aver under penalty of perjury statements she assertedly had made to a defense investigator.[31] Moreover, the representations of counsel did not suggest "a strong possibility that prejudicial misconduct ha[d] occurred." (*People* v. *Hedgecock, supra*, 51 Cal.3d at p. 419.) Without some elaboration of the context in which the reference to the Burns letter and sentence arose, the court had no basis for concluding the jury actually considered *evidence* not received at defendant's trial. (See also *People* v. *Lee* (1974) 38 Cal.App.3d 749, 755 [113 Cal.Rptr. 641].) Accordingly, the circumstances of this case did not raise any of the concerns at issue in *Hedgecock*,[32] nor did the facts before the court compel an exercise of its discretion to hold an evidentiary hearing.[33]

For several reasons, we decline to extend the holding in *Hedgecock* to situations in which the defendant merely seeks to place unsworn statements under oath by calling upon reluctant jurors to reiterate those statements from the witness stand. First, we find no constitutional, statutory, or decisional imperative supporting such an extension. A criminal defend-

---

[30] We also cautioned trial courts "not to overstep the boundaries set forth in Evidence Code section 1150." (*Id.*, at p. 418.)

[31] We find no basis for inferring Juror Whitfield was any less disinclined to testify in court than she was to complete the affidavit prepared for her signature. Counsel indicated she was present in response to a subpoena, which presumably she was loathe to disobey.

[32] Given this conclusion, we need not, and do not, resolve the question of whether the holding applies retroactively.

[33] In *Hedgecock*, we disapproved *People* v. *Scott, supra*, 129 Cal.App.3d 301, "to the extent it is inconsistent with" our conclusions therein. (*People* v. *Hedgecock, supra*, 51 Cal.3d at p. 419, fn. 9.) Factually, however, *Scott* is distinguishable, and the language we disapproved is dictum. Its actual holding thus survives; we find it apposite to the present context. As here, defendant Scott subpoenaed jurors to appear at his motion for a new trial after unsuccessfully attempting to secure affidavits from them. The requested testimony was not to resolve any conflict as to statements or events occurring during deliberations, but simply to find possible grounds for a new trial. The Court of Appeal upheld the court's refusal to have the jurors testify in the absence of any competent evidence substantiating misconduct. (*People* v. *Scott, supra*, 129 Cal.App.3d at pp. 307-308.)

By contrast in *Hedgecock*, affidavits and counteraffidavits from the 12 jurors and 2 bailiffs contained significant factual discrepancies, which might best be resolved by an evidentiary hearing. *Scott* was disapproved only to the extent it implied the trial court has *no* discretion to order such a hearing or examine jurors in resolving a question of jury misconduct. (*People* v. *Hedgecock, supra*, 51 Cal.3d at p. 419, fn. 9, and accompanying text.)

ant has neither a guaranty of posttrial access to jurors nor a right to question them about their guilt or penalty verdict. Indeed, following what we may infer is a common practice, the court in this case informed the jury they were under no obligation to speak with counsel at the conclusion of the trial. (See, e.g., *People* v. *Scott, supra*, 129 Cal.App.3d at p. 308.) That decision rests with the individual juror according his or her inclination, which the defendant may not attempt to qualify.

Second, requiring testimony under such circumstances is tantamount to the type of "fishing expedition" condemned in *Hedgecock*. Either a juror is willing to come forward and, at least on a preliminary basis, sign an affidavit or not. Unless the reticence results from impermissible interference by the court or prosecutor, the reasons therefor should not be subject to further inquiry. (See, e.g., *People* v. *Atkins* (1988) 203 Cal.App.3d 15, 23-28 [249 Cal.Rptr. 863], disapproved on other grounds in *People* v. *Jones* (1990) 51 Cal.3d 294, 322 [270 Cal.Rptr. 611, 792 P.2d 643]; cf. *In re Martin* (1987) 44 Cal.3d 1, 30-32 [241 Cal.Rptr. 263, 744 P.2d 374] [prosecutor may not engage in activity that renders willing defense witness unwilling to testify].) By analogy to Evidence Code section 1150, these mental processes must remain equally inviolate. (See also *In re Stankewitz* (1985) 40 Cal.3d 391, 398 [220 Cal.Rptr. 382, 708 P.2d 1260].)

Finally, the Court of Appeal in *People* v. *Scott, supra*, aptly identified one of the inherent dangers posed by evidentiary hearings at which jurors are examined concerning their deliberations: "To grant this kind of power to the losing attorney would open the door to harassment of jurors and . . . ultimately damage the jury process and the administration of justice." (129 Cal.App.3d at p. 308.) In the civil context, we have also recognized that "permitting counsel for the losing party to interrogate unwilling trial jurors touches the integrity of our venerable jury process. . . . [O]nce aware that after sitting through a lengthy trial he himself may be placed on trial, only the most courageous prospective juror will not seek excuse from service." (*Linhart* v. *Nelson* (1976) 18 Cal.3d 641, 644-645 [134 Cal.Rptr. 813, 557 P.2d 104] [finding new trial motion in civil cases be must made upon affidavit only (Code Civ. Proc., § 658)].) ▮ Although in *Hedgecock* we permitted a limited right to examination under specified circumstances, the justifiable concern for juror prerogatives cautions against an extension of that rule to the instant facts.

Moreover, jurors might well completely refuse to talk with defense counsel or investigators if they anticipated being called into court for subsequently declining to acknowledge their statements under oath. The untoward result of potentially foreclosing any possibility of uncovering misconduct militates against applying *Hedgecock* in a broader factual con-

text. We should also refrain from formulating any rule that would tend to "inhibit or restrict the free exchange of ideas during the jury's deliberations." (*People* v. *Elkins* (1981) 123 Cal.App.3d 632, 638 [176 Cal.Rptr. 729]; cf. Evid. Code, § 1150, subd. (a).) To the extent jurors might seek to guard against intrusive posttrial inquiry by counsel or the court, thorough and penetrating discussion of the merits of the case might suffer.

Defendant argues unpersuasively that he did confront impermissible interference with his access to the jurors, thereby preventing him from making an evidentiary showing sufficient either to support his new trial motion or at least to justify a hearing under *Hedgecock*. As to the court's actions, we find no impropriety. A trial court has inherent as well as statutory discretion to control the proceedings to ensure the efficacious administration of justice. (See, e.g., § 1044; Evid. Code, § 765; *People* v. *Melton, supra,* 44 Cal.3d at p. 734; *Cooper* v. *Superior Court* (1961) 55 Cal.2d 291, 301-302 [10 Cal.Rptr. 842, 359 P.2d 274].) The proper exercise of such discretion does not require the defense be allowed unqualified access to the jury after the conclusion of the trial. Indeed, by statute jurors now have an absolute right to decline any efforts to probe the particulars of their deliberations. (See Code Civ. Proc., § 206, subd. (a), added by Stats. 1988, ch. 1245, § 2; see also Cal. Const., art. I, § 1 [right of privacy]; *People* v. *Atkins, supra,* 203 Cal.App.3d at p. 27; Rules Prof. Conduct of State Bar, former rule 7-106(D) [now rule 5-320(D)] [counsel may not harass or embarrass jurors by questioning after trial].)

Accordingly, after being apprised of juror anxiety resulting from contacts by defense investigators, the court did not overstep its authority in directing that all further communication would be through the court clerk unless jurors were already agreeable. In this manner, the court actually preserved defendant's interests by providing a mechanism whereby the jurors could be relieved of their apprehensions if they were otherwise inclined to discuss the proceedings with defense investigators. (See also *People* v. *Atkins, supra,* 203 Cal.App.3d at p. 26.)

As for the allegedly "inflammatory" actions of the prosecutor in speaking with the press, the record does not establish any connection between the prosecutor's conduct and juror reluctance to communicate with the defense. ▋ We note in passing that, unless the prosecutor engages in some form of direct interference with a juror clearly desirous of speaking with the defense on matters that would provide grounds for a new trial, posttrial activities are generally not subject to any constitutional restraint. (Cf. *In re Martin, supra,* 44 Cal.3d at p. 31 [to establish violation of constitutional compulsory-process right, defendant must demonstrate "causal link between the [prosecutor's] misconduct and his inability to present

witnesses on his own behalf"].) Defendant alludes to his own First Amendment right to communicate with jurors; we find no basis for denying the prosecution similar freedom to express an opinion concerning the trial proceedings. (See *Cohen* v. *California* (1971) 403 U.S. 15 [29 L.Ed.2d 284, 91 S.Ct. 1780].)

Furthermore, since defendant enjoyed no right of access to the jurors, we find his reliance on the Sixth Amendment guaranties of right to counsel and a fair jury trial as well as his reference to due process unconvincing in this context.

## VI. CONCLUSION

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Kennard, J., and Baxter, J., concurred.

**BROUSSARD, J.,** Concurring.—I concur in the judgment, but write separately to express my concern on one point involving the motion for new trial and defendant's unsubstantiated claim that there was serious juror misconduct.

The sequence of events following the entry of the judgment up until the hearing on the motion for new trial is rather disturbing. There is some suggestion that the prosecutor, using the media, may have caused some jurors to become reluctant to speak to defense investigators about the possibility of jury misconduct. While I agree with the majority opinion that the record contains insufficient evidence regarding the publicity to determine that the prosecutor's conduct caused the jurors to refuse to speak to the defense investigators, and note that the trial court made every accommodation to defendant to encourage jurors to respond to defendant's questions, I would condemn any use of the press for the purpose of discouraging juror contact with the defense team as flagrant misconduct. I cannot agree with the majority that the prosecutor's "posttrial activities are generally not subject to any constitutional restraint." (Maj. opn., *ante,* at p. 700.) Obviously the prosecutor cannot act in such a way as to impair a defendant's right to a fair hearing at a motion for new trial, at imposition of sentence, or on appeal. In the case of such misconduct, the failure of the defendant to present a proper affidavit to support the motion for new trial would have to be excused.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment as to guilt and death eligibility. After review, I have found no error warranting reversal on those issues.

I dissent, however, as to penalty. In my view, the trial court erred by denying defendant's motion for new trial on that issue and by refusing his request for an evidentiary hearing relating thereto. Defendant had summoned Juror Whitfield to court; he should not have been prevented from calling her to the stand. As a result of the error, I would vacate the judgment in regard to penalty and remand the cause for a redetermination of the motion after a full and fair hearing on the question.

I also write separately to set forth my reasons for rejecting defendant's claim that in its instructions the trial court erred by failing to label the penalty factors as "aggravating" or "mitigating." In doing so, I follow my concurring opinion in *People* v. *Gallego* (1990) 52 Cal.3d 115 [276 Cal.Rptr. 679, 802 P.2d 169].

"Under the 1978 death penalty law, the determination of punishment turns on the personal moral culpability of the capital defendant. Culpability is assessed in accordance with specified factors of 'aggravation' and 'mitigation' as construed in the case law: (a) the circumstances of the crime; (b) prior violent criminal activity; (c) prior felony convictions; (d) extreme mental or emotional disturbance; (e) victim participation or consent; (f) reasonable belief in moral justification or extenuation; (g) extreme duress or substantial domination; (h) impairment through mental disease or defect or through intoxication; (i) age; (j) status as an accomplice and minor participant; and (k) any other extenuating fact.

"As used in the law, 'aggravation' means that which increases the personal moral culpability of the defendant above the level of blameworthiness that inheres in the capital offense. By contrast, 'mitigation' means that which reduces the defendant's culpability below that level.

"It follows that, strictly speaking, none of the *penalty factors* is 'aggravating' or 'mitigating.' Rather, it is the *circumstances* they define that are properly characterized as such. The point is established by the very words of the law: 'aggravating' and 'mitigating' are *always* used to modify 'circumstances,' and never to modify 'factors.'

"Therefore, I am of the opinion that the trial court did not err in its instructions by failing to label the penalty factors as 'aggravating' or 'mitigating.' It is, of course, virtually axiomatic that a court must correctly instruct on the law, and that it acts properly when it does so. Here, the court's instructions were in conformity with the law. 'Labeling' would not have been.

"I recognize that the trial court did not define 'aggravation' and 'mitigation.' To be sure, such a definition may provide a ' "helpful framework" for the jury's consideration' of the penalty to be imposed—and should therefore be given in the future to foster rational decisionmaking. In the general case, however, its omission is not error. ' "Aggravation" and "mitigation" are commonly understood terms. A trial court is not required to instruct on the meaning of terms that are commonly understood.' In my view, the failure of the court to define the words in question was not erroneous here.

"I also recognize that the trial court did not identify which circumstances were 'aggravating' and which 'mitigating.' Like the definitions referred to above, identification may aid the jury and should generally be given in the future. But also like those definitions, its omission is usually not error. A jury should be able to identify the specified circumstances as 'aggravating' or 'mitigating' by itself. This is because their nature is 'self-evident.'[1] To my mind, the failure of the court to identify the circumstances was not erroneous in this case." (*People* v. *Gallego, supra*, 52 Cal.3d at pp. 207-208 (conc. opn. of Mosk, J.), italics in original, citations omitted.)

Although the trial court did not err by failing to label the penalty factors as "aggravating" or "mitigating," as noted above it did indeed do so by denying defendant's motion for new trial on the issue of penalty and by refusing his request for an evidentiary hearing relating thereto. I would

---

[1] At this point in my concurring opinion in *People* v. *Gallego, supra*, 52 Cal.3d 115, the following footnote appears.

"Thus, it is manifest that the circumstances of the crime itself can be either aggravating or mitigating. Their character depends on the greater or lesser blameworthiness they reveal.

"The same is true of prior violent criminal activity. The presence of such activity suggests that the capital offense is the product more of the defendant's basic character than of the accidents of his situation, whereas its absence suggests the opposite.

"Similarly, prior felony convictions can be either aggravating or mitigating. Like the presence or absence of prior violent criminal activity, the existence or nonexistence of previous convictions reflects on the relative contributions of character and situation. Further, the existence of such convictions reveals that the defendant had been taught, through the application of formal sanction, that criminal conduct was unacceptable—but had failed or refused to learn his lesson.

"The age of the defendant can also be either aggravating or mitigating. Age functions 'as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty.'

"The existence of any of the following circumstances, however, is mitigating and mitigating only: extreme mental or emotional disturbance; victim participation or consent; reasonable belief in moral justification or extenuation; extreme duress or substantial domination; impairment through mental disease or defect or through intoxication; status as an accomplice and minor participant; and any other extenuating fact.

"By contrast, the nonexistence of any of the foregoing circumstances is not and cannot be aggravating. The absence of mitigation does not amount to the presence of aggravation." (*People* v. *Gallego, supra*, 52 Cal.3d at pp. 208-209, fn. 1 (conc. opn. of Mosk, J.), citations omitted.)

therefore vacate the judgment as to penalty and remand the cause to the trial court for a redetermination of the motion after a full and fair hearing on the question.

Appellant's petition for a rehearing was denied June 26, 1991.